Town of Hingham & another[1] *vs.* Department of
Telecommunications and Energy;
Massachusetts-American Water Company, intervener.

Suffolk. September 11, 2000. - January 16, 2001.

Present: Marshall, C.J., Greaney, Ireland, Spina, & Sosman, JJ.

*Water Company. Public Utilities,* Judicial review, Rate structure, Rate of return, Findings. *Administrative Law,* Agency, Judicial review, Findings, Substantial evidence, Standard of proof, Regulations. *Words,* "Used and useful."

Statement of the standard of review of a petition under G. L. c. 25, § 5, challenging a rate-setting determination of the Department of Public Utilities. [201]

Discussion of the "prudent" and "used and useful" standard employed by the Department of Public Utilities in determining a fair rate of return on a public utility's investment in property. [201-203]

The Department of Public Utilities properly applied the "prudent" and "used and useful" standard in allowing a water company to increase its rates to recover certain lease expenses. [203-204]

The Department of Public Utilities applied the proper standard of review of a leaseback arrangement between a water company and an affiliated corporation, and the record of proceedings on the water company's request for rate increases supported the department's findings, analyses, and conclusions. [204-205]

The Department of Public Utilities did not err in approving a fourteen per cent rate of return on equity to the owner-lessor of certain assets leased by a water company, where the return was fair and reasonable in light of the lessor's risks. [205-206]

In a rate setting proceeding, the subsidiary findings of the Department of Public Utilities were more than adequate to support its approval of the terms and length of a water company's leaseback arrangement as "reasonably necessary." [206-209]

Substantial evidence supported the determination of the Department of Public Utilities that costs of a water company's use of certain equipment and the cost of construction management, a required sprinkler system, and certain operating and materials expenses should be included in determining a rate increase requested by the company. [209-213]

In a rate-setting proceeding, the record did not demonstrate that the Department of Public Utilities had shifted the burden of proof from the utility seeking a rate increase to the towns. [213-215]

[1]Town of Hull.

This court declined to address an issue not addressed in the proceedings below. [215-216]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on July 12, 1996.

The case was reported by *Spina*, J.

*James A. Toomey*, Town Counsel (*James B. Lampke*, Town Counsel, with him) for town of Hingham & another.

*Daniel J. Hammond*, Assistant Attorney General, for the defendant.

*Thomas G. Tumilty*, for the intervener, was present but did not argue.

MARSHALL, C.J. The towns of Hingham and Hull (towns) appealed to a single justice of this court, pursuant to G. L. c. 25, § 5, from a May 31, 1996, decision of the then Department of Public Utilities[2] (department). The decision allowed the Massachusetts-American Water Company[3] (company) to increase base rates for all its customers, and to impose a surcharge on certain customers to recover costs associated with its new water treatment plant (plant) in Hingham. The single justice reserved and reported the case to the full court.

In November, 1995, the company petitioned the department to increase the rates in all the towns it served[4] by a cumulative amount of $5,711,056, an over-all rate increase of 98.09%. Of this amount, $1,525,552 would be a general rate increase to all customers. The remaining $4,185,504, proposed to finance the new plant, would apply only to customers in Service Area A, the towns to be served by the plant. Following thirteen days of evidentiary hearings in March and April, 1996, the department issued a 198-page order allowing the company to file schedules of rates and charges designed to recover the lease and operation costs associated with the plant. The towns filed their petition for appeal, and the company filed its motion to intervene.

[2]The Department of Public Utilities has since been renamed the Department of Telecommunications and Energy. St. 1997, c. 164.

[3]The company is a Massachusetts corporation and a wholly owned subsidiary of Greenwich Water Systems, Inc., which in turn is a wholly owned subsidiary of American Water Works Company.

[4]The company serves approximately 16,588 customers in two districts: Service Area A, which includes the towns of Hull, Hingham, Norwell, and north Cohasset; and Service Area B, the towns of Millbury and Oxford.

The towns assert that the department misapplied its own standard and precedent by finding the plant "used and useful" when it was not in service during the test year. The towns claim that the department committed an error of law by failing to apply the "affiliated transaction" standard in scrutinizing agreements between the company and Massachusetts Capital Resources Company (MassCap), a wholly owned subsidiary of American Water Works Company (American Water Works)[5] that was established for the sole purpose of financing and completing construction of the plant. The towns further claim error in (1) allowing a fourteen per cent rate of return to MassCap because that rate of return rewarded "creativity," but was not evaluated for its fairness and reasonableness; (2) not determining whether the company's financing arrangements were in the public interest and whether the leasing arrangements were the least costly alternative where customers will pay for the total cost of a plant with a useful life of 60.5 years in 40.5 years; (3) allowing the company to recoup in rates the costs associated with certain construction expenses; and (4) shifting the burden of proof to the towns. Finally, the towns argue that the department's use of 220 Code Mass. Regs. § 31.03 (1997), to set the rate of return in the base rate, is in excess of the department's authority and an illegal delegation of its responsibility. We affirm the department's order.

1. *Background.* The company is a retail water utility that, at the time of the department's decision, provided water service to six towns in the Commonwealth. The company's quality of service had been, according to the department, "a long-standing issue." The company had entered into an administrative consent order with the department pursuant to which the company agreed to several conditions, including construction of a new water treatment plant by June 29, 1996. The plant was needed to bring the company's water supply into compliance with the Federal Safe Drinking Water Act, 42 U.S.C. §§ 300j-12(g) (1994 & Supp. IV 1998), and related State laws and regulations governing the filtration, disinfection, and aesthetic qualities of drinking water.

Construction of the plant commenced in September, 1994. On July 1, 1995, the company sold its interest in the partially

---

[5]See note 3, *supra.*

constructed plant to MassCap. The company and MassCap entered into a ground lease and a facility lease, with the company agreeing to lease the plant from MassCap for 40.5 years, beginning on June 1, 1996. The expected useful life of the plant is 60.5 years, and the facility lease permits the company to renew the lease after its expiration. According to the department, this arrangement, involving project financing and a sale-leaseback, was the first among the nation's public water utilities.[6]

The total cost of the plant was estimated, at the time of the hearings, to be $39,530,000. The company sought the department's authorization to recover payments under the facility lease by adding a surcharge to the customers' water rate in Service Area A. The company's request was approved by the department's order, with certain modifications. Further facts will be presented as relevant.

*2. Standard of Review.* Our standard of review of petitions under G. L. c. 25, § 5, is well settled: a petition that raises no constitutional questions requires us to review the department's findings to determine only whether there is an error of law. See *Costello* v. *Department of Pub. Utils.*, 391 Mass. 527, 532 (1984), and cases cited. Appellants bear the burden of proving error, and we have observed that this burden is a heavy one. *Id.* at 533. *Wolf* v. *Department of Pub. Utils.*, 407 Mass. 363, 367 (1990). We give great deference to the department's expertise and experience in areas where the Legislature has delegated decision-making authority to the agency. See G. L. c. 30A, § 14. The department has broad authority to determine rate-making matters in the public interest. See *id.* at 369; *Commonwealth Elec. Co.* v. *Department of Pub. Utils.*, 397 Mass. 361, 369 (1986), cert. denied, 481 U.S. 1036 (1987); *Lowell Gas Light Co.* v. *Department of Pub. Utils.* 319 Mass. 46, 52 (1946).

*3. Used and Useful Standard.* The department evaluated the costs associated with the plant by its "prudent used and useful"

---

[6]This financing scheme historically has been used in both the oil and gas utility industries, among others. Facciolo, Book Review, 11 B.U. Int'l L.J. 165, 167 n.6 (1993) (reviewing Clifford Chance, Project Finance [1991]). See Harrell, Securitization of Oil, Gas, and Other Natural Resource Assets: Emerging Financing Techniques, 52 Bus. Law. 885, 892-893 (1997) (briefly describing project financing generally).

standard. For costs to be included in rate base,[7] expenditures must be prudently incurred, and the resulting plant must be used and useful to customers. The prudence test determines whether cost recovery is allowed at all, based on how a reasonable company would have responded to the particular circumstances and whether the company's actions were prudent in light of all circumstances known or reasonably known at the time. See *Boston Gas Co.*, D.P.U. 93-60, at 24-25 (1993). The "used and useful" analysis determines the portion of prudently incurred costs on which the utility is entitled to earn a return. The "used and useful" standard generally requires that a utility plant must be in commercial operation and providing net benefits to customers in order for expenses associated with it to be included in rate base.

The towns claim that the department committed an error of law when applying its "used and useful" standard because the plant, not in service until after the test year,[8] was not a "used and useful" capital expenditure such that its costs could be included in rate base.[9] According to the towns, the department only provides for a "post-test year adjustment" when such costs are known and measurable at the time of the order, citing *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 22, cert. denied, 439 U.S. 921 (1978), for this proposition.[10] Under the "used and useful" standard, a utility expenditure generally can

---

[7]The amount of investment on which the company is entitled to an opportunity to earn a fair and reasonable return is its "rate base." *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 360 Mass. 443, 450 (1971).

[8]The department uses the "test-year method" to determine the appropriate rates to charge. See *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 24, cert. denied, 439 U.S. 921 (1978). The test year is generally the most recent twelve-month period for which financial information exists. *Id.* The plant was not operational until April, 1996.

[9]The towns also assert that the costs of plant construction could not be included in rate base because the company could not, at the time of the hearings, identify the precise final cost of the project. We need not address this issue. The department found that it could identify the costs of the plant sufficiently to determine their eligibility for cost recovery. The department also retained authority to recalculate the rate surcharge applicable to plant costs, if necessary, when the final costs became available.

[10]The towns' reliance is misguided. In that case we reviewed whether the department had erred by not allowing the utility to recover expenses for rate base items that were not "used and useful" to the customers, and concluded that this decision was not erroneous. *Boston Edison Co.* v. *Department of Pub. Utils.*, *supra* at 21-22. However, the department did not propose, and we did not hold, that the department must always exclude rate base items that were

be included in rate base if (1) it was prudently incurred and (2) the result of the expenditure is "used and useful" by providing service to customers during the test year. *Id.* at 18-21. Accordingly, a public utility's rate base is its total prudent investment in property that is "used and useful" to the public in providing utility service during the test year. Cf. *Commissioner of Revenue v. New England Power Co.,* 411 Mass. 418, 423 (1991). See *Boston Edison Co.* v. *Department of Pub. Utils., supra* at 18-21. Once the department decides which expenses can be included in the rates, it determines a fair rate of return on the utility's investment. It is a long-standing principle that a public utility is entitled to charge rates that allow it to meet its costs of service, including a fair and reasonable return on honestly and prudently invested capital. *Lowell Gas Co.* v. *Department of Pub. Utils.,* 324 Mass. 80, 94-95 (1949).

The towns misconstrue how the department analyzed the costs associated with the plant, as these costs relate to rate base. The department indicated in its final order that, for a post-test year addition to be considered part of a utility company's rate base, the company must have an ownership interest in the addition. Because the plant was not owned by the company, but instead had been sold to, and leased back from, MassCap, the department did not analyze the plant construction costs as a capital investment to be reflected in the company's rate base. Rather, the department analyzed the lease payments to MassCap as an annual expense to the company, and inquired into the prudence of that expense as a prerequisite to allowing the company to pass the lease expenses on to the customers.

As noted in its order, the department had to "examine the overall costs of the [construction] project to determine the level of lease payments to MassCap which should be included in the . . . cost of service." The department evaluated the costs by an objective standard, determining whether, in light of all the circumstances that were known or reasonably should have been known, a reasonable company would have incurred the expense. See *Attorney Gen.* v. *Department of Pub. Utils.,* 390 Mass. 208, 228-229 (1983) (department reviews prudence of utility's expenditure in light of facts known to utility management at time decision was made and department does not substitute its

---

not used and useful during the test year. *Id.* Rather, we emphasized that the department "is not compelled to use any particular method for calculating the rate base." *Id.* at 19.

judgment for "reasonably exercised prerogatives of . . . managers"). The department concluded that evaluating the prudence of the lease expenses without treating the plant as a "used and useful" facility would have been futile, because the plant was expected to be operational within one month of the hearings, and the cost of the plant was inherently tied to the lease expenses.

We find no error in the department's application of the "prudent" and "used and useful" standard. The record supports its conclusions, and the decision was consistent with the department's precedent of allowing utilities to recover lease expenses in rates.[11]

4. *Affiliated Transaction Scrutiny.* The towns allege that the department committed an error of law by failing to scrutinize properly the leaseback arrangement between the company and MassCap, in light of their common corporate parent. See note 3, *supra.* The department's standard of review for affiliated transactions is the following: payments made by a utility to an affiliate must be (1) for activities that specifically benefit the regulated utility and that do not duplicate services already provided by the utility; (2) made at a competitive and reasonable price; and (3) allocated to the utility by a formula that is both cost effective in application and nondiscriminatory for those services specifically rendered to the utility by the affiliate. See *Milford Water Co.*, D.P.U. 92-101, at 42-46 (1992); *AT&T Communications of New England, Inc.*, D.P.U. 85-137, at 51-52 (1985).

The department found "that the lease payments should be evaluated based on the affiliated transactions standard rather than the known and measurable standard," that applies to arm's-length transactions when a utility leases a facility from a third-party landlord. The department made specific factual findings regarding each factor before including the company's lease expenses in its rate calculation. It concluded that, because the plant's maximum day reliable capacity[12] exceeded what could have been generated by alternative configurations, the plant's construction benefitted the company and did not duplicate services already performed. It was also reasonably necessary to

---

[11] See *Western Mass. Elec. Co.*, D.P.U. 85-270, at 186-187 (1986).

[12] The "maximum day reliable capacity" is the maximum single day yield (the system's ability to meet peak demand), with the company's largest source out of service.

satisfy the projected water demands of Service Area A. There were no allocation issues because the plant is for the exclusive use of the company. The department analyzed the cost basis for the plant, disallowed costs where it deemed appropriate, and concluded that the remaining costs were based on a competitive and reasonable price. The towns' assertion that the department failed to scrutinize the lease sufficiently is unsupported by the record.

5. *Fourteen Per Cent Return on Equity to MassCap.* The towns contend that the department erred by approving a fourteen per cent return on equity to MassCap in the leaseback arrangement. That rate of return, according to the towns, was approved as a reward for "creativity," not based on fairness and reasonableness.

Rates for service provided by a regulated public utility must allow a fair rate of return to investors on the value of the property used in providing those services. *Attorney Gen.* v. *Department of Pub. Utils.*, 392 Mass. 262, 265 (1984), citing *Bluefield Water Works & Improvement Co.* v. *Public Serv. Comm'n of W. Va.*, 262 U.S. 679, 690 (1923). "A return is fair and reasonable if it covers utility operating expenses, debt service, and dividends, if it compensates investors for the risks of investment, and if it is sufficient to attract capital and assure confidence in the enterprise's financial integrity." *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 371 Mass. 881, 884 (1977). *Massachusetts Elec. Co.* v. *Department of Pub. Utils.*, 376 Mass. 294, 299 (1978). The return on equity "should be commensurate with returns on investments in other enterprises having corresponding risks." *Attorney Gen.* v. *Department of Pub. Utils.*, supra at 266, quoting *FPC* v. *Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944).

The department did not approve the fifteen per cent rate of return requested by the company, despite its uncontested evidence that such a return is at the low end of returns for similar project financings.[13] The department noted that this project financing was the first nationally for a regulated water utility and that the company's examples were drawn primarily from unregulated entities. The department concluded that a fourteen per cent return on equity to MassCap reflected an ap-

---

[13]The company's project financing expert testified that, for similar project financings, typical returns on equity range from the "high teens" to approximately thirty per cent. There was no evidence presented to the contrary.

propriate reward for innovation commensurate with MassCap's risk. Although the department commended the company for structuring the innovative project financing, the record is clear that it approved the fourteen per cent return not simply to reward innovation, as the towns suggest, but also because that rate was commensurate with MassCap's risk, and because the financing package provided for lower rates, thus mitigating rate impact.

The record supports the department's finding that the risks associated with the equity return for the plant justified the rate. For example, the monthly lease payments to MassCap were comprised of both a fixed component and a variable component, which was calculated based on the plant's monthly output of "finished water." Additionally, because MassCap assumed ownership of the plant, it also assumed construction, regulatory, and operational risks inherent with ownership. Moreover, the project's heavily leveraged debt-to-equity ratio and the project's debt service requirements increased the risks to MassCap. In a traditional financing arrangement, in which the company owned the plant outright, these risks would have been borne by the company. In light of these factors, the department's approval of MassCap's fourteen per cent return on equity is commensurate with MassCap's risks. *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils., supra* at 884 (return is fair and reasonable if it compensates investors for risks).

6. *Project Financing and 40.5 Year Lease Arrangement.* The towns assert that the department erred in approving the project financing[14] and lease arrangement because it did not make subsidiary findings supporting its conclusion that this arrange-

---

[14]In a project financing, the credit supporting the financing reflects revenues from an individual project, rather than corporate or municipal credit. To accomplish this financing, American Water Works, the parent company of Greenwich Water Systems, Inc., the company's parent, established the wholly owned subsidiary MassCap solely to finance and complete construction of the plant. To finance the purchase of the plant, MassCap obtained $37,700,000 in Series 1995 Water Treatment Revenue Bonds issued by the Massachusetts Development Finance Agency (MDFA) (subjecting MassCap to significant MDFA technical requirements), which qualified as tax exempt issues. The MDFA required MassCap to secure its obligation by issuing an equal amount of Series 1995 Mortgage Bonds to the MDFA. Smith Barney, Inc., acting as underwriter, purchased MassCap's bonds for $37,644,291, and resold them to the public for the same price. These proceeds were loaned to MassCap to acquire, construct, equip, and install the plant. American Water Works infused $5,553,747 in equity into MassCap, giving MassCap a capital structure of eighty-seven percent debt and thirteen per cent equity.

ment imposed the least cost on the customers. The towns contend that customers would face lower rate increases under traditional financing, with the company purchasing the plant as its own capital asset and assuming the debt associated with ownership. They assert that the department failed to undertake any analysis or make a finding whether the cost of the lease would be less than the company owing and operating the plant outright. Alternatively, the towns assert that the department did not adequately explain why a 40.5 year lease was more appropriate than a 60.5 year lease, and argue that the lease payments would better serve the public interest if they spanned the entire expected useful life of the plant.

The department has a duty to make adequate subsidiary findings. *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 868 (1997) (quoting *Hamilton* v. *Department of Pub. Utils.*, 346 Mass. 130, 137 [1963]). General Laws c. 164, § 14, requires the department to determine whether a utility's proposed financing is "reasonably necessary" in order to accomplish a necessary purpose in meeting a utility's service obligations. *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 395 Mass. 836, 841-842 (1985), and cases cited. The department next considers whether the financing arrangement is in the public interest. On a case-by-case basis, the department determines whether the proposed financing approach is prudent, reasonable, and acceptable, by examining financing alternatives, including alternative corporate structures, and the benefits and costs of each method.

The department's subsidiary findings are more than adequate to support its approval of the lease arrangement. An agency must make all findings necessary to its decision (G. L. c. 30A, § 11 [8]), but need not make detailed findings of all evidence presented to it, as long as its findings are sufficiently specific to allow us to review its decision. See *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils., supra* at 858-859. Cf. *Maddocks* v. *Contributory Retirement Appeal Bd.*, 369 Mass. 488, 497 (1976). The department concluded that the project financing, with its 40.5 year lease arrangement, provided "substantial savings over traditional financing."

The company agreed to lease the plant from MassCap for 40.5 years pursuant to a facility lease agreement, which expires on December 1, 2035, the date of final maturity of all MDFA bonds. The lease is an operating lease in accordance with the

accounting requirements of the financial accounting standards board.[15] With an operating lease, no asset or liability is reflected on the lessee's balance sheet. A capital lease, in contrast, is reflected in the lessee's balance sheet as both an asset and a liability at the inception of the lease. If the lease had been structured as a capital lease, the company would have had to impute MassCap's debt to itself, carry the lease as an asset, and recognize an annual expense equal to the sum of the depreciation on the plant and interest expense on the obligation. The company presented extensive evidence that treating the lease as a capital lease would place its own debt instruments into default.

The towns advocated spreading the payments equally over the 60.5 year life of the plant, claiming that this would result in a total rental expense over the life of the lease of $122,331,626, rather than the $160,639,000 under the lease as currently configured. After considering their evidence, the department specifically found the lease, which spreads the rent payments over 40.5 years,[16] to be in the public interest. The department further found that treating the lease as an operating, rather than capital, lease provides benefits and cost savings to the ratepayers. The department also found that spreading the payments over 60.5 years created too great a risk of the lease's being treated as a capital lease.[17] For these reasons, the department explicitly rejected the towns' proposed modifications to the length of the lease.

The towns further assert that the department failed to state subsidiary findings that support this conclusion. We disagree. The department examined the benefits and cost savings associated with both traditional and project financing and found that the project financing scheme provided immediate cost savings

---

[15]According to the department, under financial accounting standards no. 13, par. 7, a lease will be considered a capital lease if, among other things, the term of the lease is equal to or greater than seventy-five per cent of the estimated economic life of the asset.

[16]The lease may be renewed, but the length of the lease, including any renewal periods, can be no more than seventy-four per cent of the expected useful life of the plant, which translates to forty-five years.

[17]The department stated that "[t]he record clearly demonstrates that if the [plant] were treated as a capital lease on the [c]ompany's books, [the company's] debt would no longer meet the indenture requirements, thereby resulting in major, adverse financial repercussions to the [company] to the point where continued reliability of service to [the company's] ratepayers could be jeopardized."

to customers. Accordingly, the department concluded that project financing, not traditional financing, was in the public interest.

The department found that "[h]ad the [c]ompany financed and constructed the [plant] under traditional utility financing, the annual revenue increase necessary to support a $40 million [plant], including depreciation, return, income taxes, and operating costs, would have been approximately $7 million." This compares unfavorably with the $4.2 million annual revenue increase under the project financing plan.

The department further found that the company, due to restrictions resulting from its own capital and mortgage structure and traditional utility financing restrictions, would not have been able to benefit from the leverage allowed by the marketplace for a less restricted entity. MassCap, as an entirely unencumbered company, was able to achieve an 87:13 debt-to-equity ratio, compared to the maximum allowable 65:35 ratio available to the company under its indentures. The department found that the use of increased debt, and the tax-exempt status associated with the debt issued by the MDFA, allowed the company to decrease the cost impact on the ratepayer by approximately $18.7 million over the term of the lease.

In short, the department made specific subsidiary findings of fact on all matters relevant to this inquiry, and "set forth the manner in which it reasoned from the subsidiary facts so found to the ultimate decision reached." *School Comm. of Chicopee* v. *Massachusetts Comm'n Against Discrimination*, 361 Mass. 352, 355 (1972). To the extent that the towns disagree with the department's finding, the resolution of conflicting evidence is for the department, not the courts. *Borden, Inc.* v. *Commissioner of Pub. Health*, 388 Mass. 707, 723, cert. denied sub nom. *Formaldehyde Inst., Inc.* v. *Frechette*, 464 U.S. 936 (1983).

7. *Costs Associated with Certain Construction Expenses, Technology, and Operating Expenses.* The towns contend that the department improperly permitted the company to recoup in its rates the costs associated with certain construction expenses, either because the record lacked substantial evidence that the costs were prudently incurred, G. L. c. 30A, § 14 (7) (*e*), or because the department deviated from past precedent, thus depriving the towns of the reasoned consistency expected in the department's decisions. See *Boston Gas Co.* v. *Department of Pub. Utils.*, 367 Mass. 92, 104-105 (1975). The towns challenge (a) the cost of mechanical dewatering centrifuges; (b) fees paid

to the construction manager; (c) the cost of the building-wide sprinkler system; and (d) the operating and chemical costs.

Our review under the substantial evidence test is limited; we uphold the decision "as long as the findings by the authority are supported by substantial evidence in the record considered as a whole." *1001 Plays, Inc.* v. *Mayor of Boston*, 387 Mass. 879, 885 (1983). See G. L. c. 30A, § 14 (7) (we must determine whether agency decision is supported by substantial evidence "upon consideration of the entire record, or such portions of the record as may be cited by the parties"). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6). We defer to an agency on questions of fact and the reasonable inferences that can be drawn therefrom. See *Massachusetts Mun. Wholesale Elec. Co.* v. *Energy Facilities Siting Council*, 411 Mass. 183, 199 (1991).

a. *The cost of mechanical dewatering centrifuges.* The towns assert that there is no substantial evidence in the record demonstrating the financial prudence of using mechanical centrifuges, instead of less expensive sludge lagoons,[18] to process residual solids from the plant. The department concluded, after analyzing evidence presented by both parties, that the use of centrifuge technology was prudent and reason-able. In support of this conclusion, the department noted that the company had originally planned to use a sludge lagoon, but decided against that course of action, because of the public outcry. Furthermore, the company was required to minimize the size of the plant, and a lagoon would have covered several acres of open land. Numerous pilot tests with various dewater-ing techniques produced highly unsatisfactory results. Accord-ingly, the department found that a lagoon would not have been effective and determined that expenses related to the centrifuges were prudently incurred. This decision is supported by substantial evidence, and therefore we shall not disturb the department's findings.

b. *Costs associated with the construction management arrangement.* The towns argue that hiring a general contractor

---

[18]The technologies in dispute are different ways to treat the residual solids (or sludge) left behind after water is processed. A sludge lagoon is a pit dug in the ground, where sludge is held until it is "dewatered" or dry enough to remove. Mechanical dewatering centrifuges are more mechanized methods of drying the residual solids for eventual removal.

would have been less expensive and that the prudence of using a construction manager, rather than a general contractor, which they claim would have cost less, was not supported by substantial evidence. The towns also claim that the department departed from past precedent and failed to provide a decision of reasoned consistency because Bec-Mor Joint Venture, Inc. (Bec-Mor), the firm selected as construction manager, did not go through a competitive bidding process.[19] See *Boston Gas Co.* v. *Department of Pub. Utils., supra* at 104. We address these claims together, because the towns assert that the use of competitive bidding would have resulted in a less expensive, and thus more prudent, construction arrangement.

It is true that the company's selection of Bec-Mor as its construction manager was not the product of formal competitive bidding, but rather evolved from negotiations between the company and Bechtel Construction Company, one of Bec-Mor's principals. The towns contend that department precedent dictates that "competitive bidding is essential to ensuring the lowest possible price for constructing a new plant." This is an incorrect interpretation of department precedent, and the towns cite no judicial precedent to support the proposition. The department has indicated that a competitive bidding process gives rise to a strong inference that a utility company has paid a reasonable price for services, and encourages utilities to use such a process. See *Milford Water Co.,* D.P.U. 84-135, at 3-4 (1985). We are presented with no evidence that the department has ever concluded that this is the only way for a utility to meet its burden of demonstrating prudent spending.

In this case, the company offered evidence that the Bec-Mor proposal was competitively priced within the industry.[20] Contrary to a claim by the towns, the record indicates that all subcontracts awarded by Bec-Mor were competitively bid. The

---

[19]The company initially put construction of the plant out to competitive bid, but terminated the bidding process and awarded the construction contract to Bec-Mor Joint Venture, Inc. (Bec-Mor), a joint venture of Bechtel Construction Company and Morganti, Inc. Both Bechtel and Morganti have had experience in the construction of water treatment plants.

[20]The company's parent, American Water Works, was building a similar plant in New Jersey at the same time. That entire project was competitively bid, and the company used the figures from that project to help evaluate whether Bec-Mor's offer was competitive within the industry. The company kept the price of the Hingham project at the low end of prices set for the New Jersey project, and there was evidence in the record that construction costs

record also demonstrates that Bec-Mor had special expertise in water plant construction; that the construction management contract was the result of arm's-length negotiations; that a guaranteed maximum price feature of the contract served to control costs; that the over-all price was consistent with industry norms; and that incentives incorporated into the contract, particularly the provision allocating a fixed percentage of all project savings to Bec-Mor in its role as general contractor, favored cost containment.

The towns further assert that the costs associated with the construction management arrangement should have been disallowed because it would have been cheaper to use the traditional general contractor approach. However, the department specifically found that the contractor fees of between $1.5 and $2.2 million "would have been incorporated into Bec-Mor's general conditions and supervision fee . . . in a general contractor approach," and the costs of the two methods would have been similar.

The department concluded that the costs of the company's construction management contract with Bec-Mor were prudently incurred, and that there was "no evidence" in the record to support the contention that construction management was inappropriate for this project. There was substantial evidence in the record to support this conclusion. We find no error in the department's conclusion.

c. *Costs associated with building-wide sprinkler system.* The towns dispute the prudence of the $227,000 cost associated with a building-wide sprinkler system in the plant, again asserting that the department findings were unsupported by substantial evidence. The towns also assert that the department's inclusion of this expense is not adequately explained in its order.

The permits granted by Hingham for construction of the plant required the sprinkler system. The department explained that the town of Hingham and the abutters to the plant would be protected by this "more proactive fire protection system," and concluded that the "full sprinkler system . . . is beneficial to all parties." We defer to the department's conclusions, which are supported by record evidence and adequately explained in its decision.

were generally lower in New Jersey than in Massachusetts at the time of the plant construction.

d. *Costs associated with chemical and operating expenses.* The towns assert that the department departed from precedent by including in the rates the operating and chemical costs for the plant. See *Boston Gas Co.* v. *Department of Pub. Utils.*, *supra* at 104. According to the towns, past department precedent would deny these costs because the plant was not operational during the test year, and such costs were therefore not "known and measurable."

The company estimated that its operating expenses would exceed the test year operating expenses by $780,864. The company calculated these costs by transferring cost experience from similar facilities and adjusting for inflation to represent the first year of additional operating costs for the plant. The department recognized that the new plant would constitute an "extraordinary post-test year change" in the company's operation, and found that, although "the additional operating expense cannot be known and measured with the degree of certainty required for inclusion in cost of service, the circumstances of this case are sufficiently extraordinary to warrant a departure from traditional ratemaking requirements so as to avoid a severe financial impact on the company." The department found that the company had provided reasonably comprehensive estimates, and that the aggregate additional cost of operating the plant was likely to approximate the company's projections, and included $757,484 in the rates.

The decision to consider post-test year changes in cost was in accordance with department precedent. See *Assabet Water Co.*, D.P.U. 95-92, at 6 (1996). Additionally, the department's decision to depart from its former requirement that such costs be "known and measurable" was adequately explained. See *Robinson* v. *Department of Pub. Utils.*, 416 Mass. 668, 673 (1993) ("the requirement of 'reasoned consistency' . . . means that any change from an established pattern of conduct must be explained . . . [but] [i]t does not mean that the [department] may never deviate from its original position"). The department did not err in including these costs in the rate increase.

8. *Burden of Proof.* The towns claim that the department committed an error of law by inappropriately shifting the burden of proof to the towns, rather than requiring the company affirmatively to prove that the rate increase was reasonable.

The burden of proving the propriety of a rate increase remains with the utility seeking the increase. See *Metropolitan Dist. Comm'n* v. *Department of Pub. Utils.*, 352 Mass. 18, 24 (1967)

(when new rates are proposed, burden is on utility to show their "propriety"); *Wannacomet Water Co.* v. *Department of Pub. Utils.*, 346 Mass. 453, 463 (1963). The utility must demonstrate that a capital cost or expense was properly incurred, and if it fails to carry this burden, the department excludes that cost or expense from rate base. See *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 375 Mass. 571, 582-583 (1978).

The towns allege that the department shifted to them the burden of proving the impropriety of the costs in three instances: (a) the approval of the construction management approach; (b) the cost of concealing the heating, ventilation, and air conditioning (HVAC) equipment in the plant; and (c) the cost of using mechanical centrifuges rather than sludge lagoons. For the reasons discussed below, we conclude that there was no error.

a. *Construction management.* As explained above, *supra* at 210-212, the record indicated and the department found that the construction management approach was appropriately structured to minimize construction costs. The department received evidence from the towns asserting that it would cost less to use a general contractor, but accepted the company's evidence on this issue, and specifically found that the fees would have been similar in either construction model. When the department stated that "Hingham and Hull have failed to demonstrate that Bec-Mor's general conditions and supervision fee would have been less under a traditional general contractor approach than the combined contractor fee and general conditions and supervision fee," it was simply indicating that it had considered the towns' evidence, but was unpersuaded by it in the face of the company's prima facie case of prudence.

b. *HVAC equipment.* The company submitted evidence that the concealment of HVAC equipment was necessary. The cost of concealment was approximately $4.3 million. When considering the prudence of the HVAC costs, the department noted that it had already accepted as reasonable the company's decision to place the plant into a single building, rather than a multiple building complex as originally proposed. The department found that this design modification would have had a significant impact on total HVAC expenditures. The department determined that any additional expense "associated with concealing the HVAC equipment would have been small in relation to the total expenditures for this category" that were necessitated by the single-building design. Therefore, the department concluded,

"there is no basis on which to conclude that these expenditures were imprudent and unreasonable." Again, in light of the evidence presented by the company and relied on by the department, nothing indicates that the department shifted the burden to the towns.

c. *Use of mechanical centrifuges.* The department, when concluding that the use of mechanical centrifuge technology was appropriate, listed and accepted as true several items of evidence presented by the company supporting this technology, as already discussed, *supra* at 210. After analyzing the company's evidence, the department noted that "[i]n contrast" to all the affirmative evidence presented by the company, the towns had not "demonstrated that the use of lagoons was feasible." The department concluded that the company's decision to use centrifuge technology over lagoons was "prudent and reasonable." Once again, nothing in the department's decision supports the towns' assertion that the company "was required to make little or no showing" of the propriety of the costs in question, or that the towns were forced to carry the burden of proving lagoons were feasible. The department was once again indicating that it had analyzed the towns' evidence, and did not find that it rebutted the company's evidence to the contrary.

The essence of the towns' argument regarding burden shifting seems to hinge on the fact that, as a matter of semantics, certain findings are stated in the negative. The department did not commit legal error simply by noting the lack of evidence presented by the towns to support their contentions. See *Wolf* v. *Department of Pub. Utils.*, 407 Mass. 363, 373 (1990). The department is prudent to address in its order the claims of the opposing party, so that we may "determine whether any of these . . . claims . . . are valid." See *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 870 (1997).

9. *The validity of department regulation 220 Code Mass. Regs. § 31.03 (1997).* On appeal, the towns challenge the validity of the department's regulation, set forth at 220 Code Mass. Regs. § 31.03 (1997), which provides an optional formula to assist the department in determining the allowed rate of return on equity for water companies. As far as the record indicates, the towns did not raise this argument before the department. Accordingly, we do not consider it on appeal. *M. H. Gordon & Son* v. *Alcoholic Beverages Control Comm'n*, 386 Mass. 64, 68 (1982) ("The general rule is that it is too late to raise a claim

before a reviewing court if the point had not been raised before the administrative agency"). *Charron's Case*, 331 Mass. 519, 523 (1954).

10. *Conclusion.* Judgment shall enter in the county court affirming the department's May 31, 1996, decision in all respects.

*So ordered.*