SHERMAN M. WOLF & another[1] vs. DEPARTMENT OF
PUBLIC UTILITIES & others.[2]

Suffolk. January 10, 1990. - May 14, 1990.

Present: LIACOS, C.J., ABRAMS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Public Utilities*, Judicial review. *Department of Public Utilities. Administrative Law*, Judicial review. *Mobile Radio Communication System. Telephone Company. Words*, "Public interest," "Public convenience and necessity."

In a proceeding for approval of a telephone company's proposed transfer of certain radio utility assets, the Department of Public Utilities did not err in applying a "public convenience and necessity" standard. [367-371]

In a proceeding for approval of a telephone company's proposed transfer of certain radio utility assets, the Department of Public Utilities did not improperly shift the burden of proof to interveners who opposed the transfer. [371-373]

The Department of Public Utilities erred in approving a telephone company's transfer of certain radio utility assets without first determining whether the prospective purchaser's offer represented the fair market value of the assets. [373-376]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on October 13, 1989.

The case was reported by *Nolan*, J.

*Jerry E. Benezra* for the plaintiffs.

*George Michaels (Alan J. Bouffard* with him) for Radio Telephone Systems, Inc.

*Bartlett L. Thomas* for New England Telephone and Telegraph Company.

---

[1]Cybertel Corporation. We refer to the plaintiffs collectively as "Wolf."

[2]New England Telephone & Telegraph Company and Radio Telephone Systems, Incorporated, interveners.

*Douglas H. Wilkins*, Assistant Attorney General, for Department of Public Utilities.

ABRAMS, J. We review, on reservation and report by a single justice of this court, the appeal of Sherman M. Wolf and Cybertel Corporation (Wolf) from the decision and order of the Department of Public Utilities (department) in *Radio Telephone Syss., Inc.*, D.P.U. No. 88-221/88-235. See G. L. c. 25, § 5 (1988 ed.). At issue is the decision of the department to approve the transfer of certain radio utility assets from New England Telephone and Telegraph Company (NET) to Radio Telephone Systems, Incorporated (RTS). Wolf argues that, in approving the transfer, the department committed legal error by (1) applying the wrong standard of review; (2) reversing the burden of proof; (3) deferring a determination of the fair market value of the assets to a future rate setting case. We conclude that the department erred in approving the transfer without first determining whether RTS's offer represented the fair market value of the assets. We reverse that portion of the decision and order approving the transfer. We remand to the single justice for remand to the department for a determination whether RTS's offer represents the fair market value of NET's radio utility assets.

In November, 1988, RTS filed an application with the department for a certificate of public convenience and necessity to operate a mobile radio utility system and filed a proposed tariff of rates and charges. At the same time, NET filed a request with the department to withdraw its mobile telecommunications service tariff, subject to the department's approval of the transfer of its radio assets to RTS. The department consolidated the two proceedings. The department granted leave to Wolf to intervene, but only on the issue whether the department should approve the transfer of assets.

After hearing, the department issued a decision and order approving the transfer of assets; granting RTS a certificate of public convenience and necessity; and approving RTS's proposed tariffs. See *Radio Telephone Syss., Inc.*, D.P.U. 88-221/88-235. Wolf filed a petition for appeal, see G. L. c. 25,

§ 5, challenging only the approval of the asset transfer, and filed a motion for stay of the department's transfer order pending appeal. NET and RTS filed petitions to intervene in this appeal, to which Wolf assented. After hearing, the single justice granted the stay and reserved and reported the matter to the full court without decision.[3]

We summarize the facts. In 1985, NET sought the department's approval to transfer its radio utility assets to a subsidiary of NYNEX Mobile Communications Company (NYNEX Mobile), which is itself affiliated with NET. The department found that the proposed transfer was not in the public interest, in part because of the long-term anticompetitive implications[4] of that proposed transfer, and denied approval for the transfer. See *New England Tel. & Tel. Co.*, D.P.U. 86-17. The department concluded that decision by stating that it "would not be opposed to [the transfer of NET's assets if it] was at fair market value as determined through a competitive bidding process or through an independent appraisal, since such a transfer would eliminate our concerns about the anticompetitive impact and the negative effects upon NET's remaining customers."

In August, 1986, NET employed Arthur D. Little Valuations, Inc. (ADLV), to conduct an independent appraisal of the assets. ADLV concluded that their fair market value was $866,389. NYNEX Mobile subsequently decided that it was no longer interested in the assets. NET then directed NYNEX Corporation Planning and Marketing Department (NYNEX Planning) ". . . to negotiate the sale of its radio service business at the highest price possible through a competitive bidding process." NYNEX Planning identified po-

---

[3]The stay applied only to that portion of the department's decision approving the transfer of assets.

[4]Anticompetitive factors discussed by the department included the following: the transfer was not an arm's-length transaction; NET made no effort to establish a market price for the assets; the proposed transferee was an affiliate providing service in a competitive market, but was not subject to rate base regulation; and the assets being transferred would be used to provide services in a competitive market. See *New England Tel. & Tel. Co.*, D.P.U. 86-17, at 12-17.

tential buyers of the assets, consisting of parties who previously had indicated interest in purchasing NYNEX Mobile's radio utility assets in New York; other businesses currently offering paging or related mobile services in the Northeast; parties suggested by brokers and investment bankers familiar with the industry; and persons who previously expressed to NET an interest in the business.

NYNEX Planning prepared an offering memorandum, which was distributed to between thirty and forty potential buyers. NET received six bids. On May 12, 1988, an affiliate of RTS offered to purchase all of the assets for $5 to $10 million subject to due diligence and further investigation. Following a due diligence review, RTS lowered its offer to $2.5 million, of which $2.1 million was for assets in Massachusetts. Of the five other bidders, NET conducted follow-up discussions with the next two highest bidders, Ram Broadcasting, which bid $750,000 for all of the radio common carrier (RCC) assets, and Message Center Beepers, which bid $750,000 for NET's improved mobile telephone service and some New York State radio services. On July 29, 1988, NET accepted RTS's offer and an agreement was executed on September 9, 1988.

In November, 1988, NET and RTS sought the department's approval for the transfer of assets. Testimony in the record shows that in November or December of 1988, Sherman Wolf and Cybertel Corporation, an Illinois corporation, engaged in the paging and cellular telephone business in the Midwest. Cybertel was not a competitor in the Northeast market. Neither Wolf nor Cybertel was on the radio common carrier service list maintained by the department. Cybertel and Wolf formed a partnership for the purposes of intervening in the department proceeding and, if successful in the intervention, subsequently to bid on NET's RCC assets. In January of 1989, the department allowed Wolf and Cybertel to intervene in the RTS transfer case.

Eleven days of evidentiary hearings were held, at which Wolf argued that the department should not approve the transfer on the grounds that NET's bidding process was in-

adequate and "that the proposed [sale] price was substantially below the fair market value for those assets." The record shows that three days before the hearing concluded, MassPage, Inc., a Massachusetts corporation organized by Wolf and Cybertel, made a $3.5 million "minimum bid" to NET, which it purported to guarantee with a photocopy of an irrevocable letter of credit payable to NET in the amount of $3.5 million if certain conditions precedent were met. Wolf offered the letter as evidence that $2.5 million did not represent a fair market value of the assets.

The department approved the proposed transfer, finding that it would "not have an adverse impact on the public convenience and necessity." The department deferred any determination whether RTS's $2.5 million offer represented the fair market value of the assets until NET's next general rate investigation.

Our review of petitions under G. L. c. 25, § 5, is limited, although not perfunctory.[5] See *Costello* v. *Department of Pub. Utils.*, 391 Mass. 527, 533 (1984). "We will uphold the department's actions unless the plaintiffs can demonstrate that they are flawed by an error of law, lack support by substantial evidence, are arbitrary or capricious, or suffer from one of the other defects spelled out in [G. L. c. 30A,] § 14 (7)." *Zachs* v. *Department of Pub. Utils.*, 406 Mass. 217, 219-220 (1989). See *Martorano* v. *Department of Pub. Utils.*, 401 Mass. 257, 261 (1987). "General Laws c. 25, § 5, allocates to [the plaintiffs] the burden of proving such error. This burden is a heavy one. We give great deference to the department's expertise and experience in areas where the Legislature has delegated to it decision making authority. G. L. c. 30A, § 14." *Costello, supra* at 533.

1. *Standard of review.* Wolf argues that the department committed legal error by employing the wrong standard to review the proposed transfer of assets. Pursuant to G. L.

---

[5]General Laws c. 25, § 5, states in pertinent part: "An appeal as to matters of law from any final decision, order or ruling of the [Department of Public Utilities] may be taken to the supreme judicial court by an aggrieved party in interest . . . ."

c. 159, § 12B,[6] the department previously issued a regulation governing the transfer of radio utility assets, which provided in relevant part that "[n]o person holding a certificate shall transfer ownership or control of the facilities covered by said certificate unless the certificate holder has obtained approval by the Department upon a finding by the Department that the transfer will not adversely affect the public convenience or necessity." 220 Code Mass. Regs. § 35.08 (1986). In reviewing NET's application to sell its assets to RTS, the department applied the "public convenience or necessity" standard from that transfer regulation. Wolf claims that this "totally unexplained decision" constitutes an error of law.[7]

Wolf correctly notes that telephone utilities such as NET are excluded from the application of § 12B, see G. L. c. 159, § 12D, and that telephone utilities are excluded from the definition of "radio utility" in both G. L. c. 159, § 12A, and

---

[6]General Laws c. 159, § 12B (1988 ed.), states, in part, that "[n]o person offering or proposing to offer mobile radio telephone service . . . shall begin or continue the . . . operation of any mobile radio utility system . . . without a certificate issued by the department which indicates that the public convenience and necessity require such [operation] . . . . The department shall issue rules and regulations governing the issuance of such certificates."

[7]Contrary to Wolf's claim, the department offered considerable explanation as to its reasons why it concluded that the regulation's standard applied. The department's decision distinguished between the circumstances of the proposed transfer in D.P.U. 86-17 and in the present case. D.P.U. 86-17 involved a transfer by NET, a regulated utility, to an unregulated affiliate at net book value without any effort to establish the market value of the assets. The decision explained that "where a utility whose rates are regulated on the basis of cost of service and return on rate base proposes to transfer assets to an unregulated affiliate, special care must be taken in evaluating the impact on the public interest, to prevent the cross-subsidization of the unregulated entity by the regulated company's ratepayers, to the detriment of ratepayers and potential competitors."

The proposed transfer here involved an arm's-length agreement between non-affiliates after a competitive bidding process. Accordingly, "the RTS transfer [did] not raise the question of cross-subsidization of affiliates which dominated the NYNEX Mobile transfer hearings." The department concluded that here it "need not undertake as strict a review of the particulars of the RTS transaction as that required in the case of a proposed transfer to an affiliate."

the transfer regulation, 220 Code Mass. Regs. § 35.02 (8).[8]
Wolf argues that, because the transfer regulation on its face
does not apply to NET, the proposed transfer of assets can-
not be judged by that regulation's "public convenience and
necessity" standard. Rather, Wolf maintains that "review is
governed by G. L. c. 159, § 12, under which [the depart-
ment] 'possesses general supervisory authority over common
carriers' . . . . Exercising that criterion [in DPU 86-17] the
[d]epartment held it 'must examine the proposed asset trans-
fer . . . to determine whether the transaction as proposed is
appropriate *and in the public interest*' " (emphasis supplied
by Wolf). Wolf concludes that the department should have
applied the "public interest" standard.

    At the outset, we note that Wolf's argument makes much
of a supposed distinction between the "public convenience
and necessity" and the "public interest." We have stated,
however, that "the phrase 'public convenience and necessity'
is a term of art that stands for the general notion of 'public
interest.' " *Zachs* v. *Department of Pub. Utils., supra* at 224.
"The common theme running through our cases in this re-
gard is that, since the mission of the agency is to regulate in
the public interest, this is the overriding meaning of the term
'public convenience and necessity.' " *Id*. at 223. Applying the
"public convenience and necessity" standard then would sat-
isfy any "public interest" requirement.[9] Cf. *id*. at 224 (con-

---

[8]In its decision, the department stated that "NET is a mobile radio com-
mon carrier within the meaning of G. L. c. 159, § 12A. See St. 1973,
c. 936, § 2, under which the authority of existing RCC's was
grandfathered on the introduction of the requirements of sections 12A et
seq." Wolf argues that this is "plainly and unambiguously wrong as a mat-
ter of law." We agree with Wolf that NET is not a mobile radio common
carrier. Section 2 of St. 1973, c. 936, stated that any existing operator of a
mobile radio utility system would be issued a certificate of public conve-
nience and necessity as required by G. L. c. 159, § 12B, and by § 1 of that
act. Nothing in § 2 grandfathered NET with respect to the exclusion from
the definition of "radio utility" found in G. L. c. 159, § 12A, nor from the
exception in G. L. c. 159, § 12D.

[9]We also note that, in explaining the standard that it was applying here,
the department did not abandon the "public interest" language. The deci-
sion stated that "[t]he department must examine the public interest in this

cluding "that it was not error for the department to use the concept of 'public interest' in determining that [the] application satisfied the 'public convenience and necessity' test").

The department argues that here it could use the standard embodied in the regulation even if that regulation did not technically apply. We agree with the department. Wolf concedes that review is governed by G. L. c. 159, § 12;[10] however, that statute does not specifically address transfers of radio utility assets by telephone utilities nor does it prescribe a particular standard for reviewing such a transfer. Indeed, there are no statutes or regulations governing the transfer of radio assets by telephone utilities. Thus, the decision regarding what standard to apply in that situation is left to the department's discretion. "In reviewing administrative agency decisions, this and all other courts are required to give 'due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it.' G. L. c. 30A, § 14 (8)." *Dohoney* v. *Director of Div. of Employment Sec.*, 377 Mass. 333, 337 n.3 (1979), quoting *Raytheon Co.* v. *Director of Div. of Employment Sec.*, 364 Mass. 593, 595-596 (1974). "Like any administrative agency, the [department] may, at its discretion, announce and apply new rules and standards in an adjudicatory proceeding." *Brookline* v. *Commissioner of the Dep't of Envtl. Quality Eng'g*, 387 Mass. 372, 379 (1982).

We find no error in the application of the "public convenience and necessity" standard here. Although § 12B does not expressly apply to NET, it does apply to RTS, and as a result, in order to operate a mobile utility system, RTS was

---

transaction in the context of the transfer of mobile radio common carrier assets between nonaffiliates. . . . In examining an application to transfer ownership of the facilities used to operate mobile radio telecommunications services, the Department looks at the impact of the transfer on the public interest. *Aircall Northeast, Inc./Arch Connecticut Valley, Inc.*, D.P.U. 89-75, p. 1 (1989)."

[10]General Laws c. 159, § 12, grants to the department, in relevant part, "general supervision and regulation of, and jurisdiction and control over . . . common carriers" such as NET.

required to apply for and obtain a certificate of public convenience and necessity. See G. L. c. 159, § 12B; 220 Code Mass. Regs. §§ 35.03-35.07. In order to grant such a certificate, the department had to make a finding of public convenience and necessity. See, e.g., *Zachs, supra* at 220.

2. *Burden of proof.* Relying on *Deacon Transp., Inc.* v. *Department of Pub. Utils.*, 388 Mass. 390, 394 (1983), Wolf claims that "[t]he party seeking a certificate of public convenience and necessity bears the burden of producing affirmative evidence to justify its application. . . . The applicant cannot rely on the failure of opponents to produce countervailing evidence." Wolf argues that the department's use of the public convenience and necessity standard erroneously shifted to Wolf the burden of showing "that there was no adverse impact to the public interest, rather than requiring NET and RTS to prove affirmatively that the transfer is in the public interest." There was no legal error. NET and RTS were required to show only "that the transfer [would] not adversely effect the public convenience or necessity." 220 Code Mass. Regs. § 35.08. Moreover, nothing in the record before us nor in the department's decision suggests that the department placed that burden on Wolf. The department asserts that its "decision turned upon the fact that NET employed a sufficient bidding process in an arm's-length transaction, resulting in a price adequately related to market value. Showing these facts met [NET's] burden." The department argues that, because it "decided, in D.P.U. 86-17, to rely upon market value 'as determined through a competitive bidding process . . . ,' [i]t can hardly be surprising, then, that the Department chose to rely upon the characteristics of the transaction to meet NET's *prima facie* case."

Wolf asserts that the "Department never once addresses any evidence offered by NET and RTS to meet their burden of proof. . . . [T]here was no evidence in the record that the Department could use to support a finding that this transfer was in the public interest. To the contrary, the Department specifically talked in terms of the failure of the record (presumably through evidence that would be offered by [Wolf]),

to prove negatives."[11] The department responds that "it made affirmative findings based upon evidence introduced by NET." We agree. Four witnesses testified on behalf of NET. The decision makes extensive citation to their testimony, as well as to documents offered by NET and RTS. Those factual findings were the basis for the department's analysis and its ultimate finding that the transfer was not adverse to the public convenience and necessity. To the extent that Wolf simply disagrees with the department's findings, "[t]he resolution of conflicting evidence is for the [department], not the courts. *Borden, Inc.* v. *Commissioner of Pub. Health*, 388 Mass. 707, 723 [, cert. denied sub nom. *Formaldehyde Inst., Inc.* v. *Frechette*, 464 U.S. 936] (1983). Courts do not substitute their judgment for that of the agency." *Commonwealth* v. *B & W Transp., Inc.*, 388 Mass. 799, 805 (1983), and cases cited. See *Martorano* v. *Department of Pub. Utils.*, 401 Mass. 257, 261 (1987).

The department argues that Wolf's "claim depends solely upon the fact that, as a matter of semantics, certain findings are stated in the negative. . . . The Department's findings that nothing in the record suggested an undue limitation on the bidding process or an anticompetitive impact simply

---

[11]In support of their argument, Wolf points to several findings in the decision as evidence that the department shifted the burden. At the hearing, Wolf challenged the content of the offering memorandum. The department found that "[a] careful reading of the Offering Memorandum itself reveals that it contained indications of the possibility of negotiation. We cannot conclude that the document was misleading." Wolf claims this shows that the department placed the burden on them to demonstrate that the memorandum was misleading rather than finding that NET had demonstrated that it was not in fact misleading. Wolf also challenged the memorandum's distribution. The department found that "the record indicates that NET distributed the offer to between 30 and 40 potential buyers . . . . There is nothing to suggest that NET limited the list so as to avoid potentially high-priced offers. This does not mean that we find that NET took all possible actions to insure a maximum bid price. However, for the purposes of this case and based on this record, we find that NET sought a sufficiently wide target market so that a *bona fide* offer could be expected from the Offering Memorandum." Wolf claims that "the Department again fails to require NET to meet its obligation to show that its list in fact would lead to potentially high-priced offers."

demonstrated that the applicants' *prima facie* case had not been rebutted. This was not a shift in the burden of proof." We agree with the department that "[i]t is not surprising that, in rejecting [Wolf's challenges], the Department referred to the absence of evidence to support Wolf's contentions."

3. *Deferral of fair market value determination.* In approving the transfer here, the department found that "[i]t is sufficient for the purposes of this case that the RTS agreement was a *bona fide* arm's-length transaction between non-affiliates, that the Offering Memorandum sufficiently described the assets to be transferred and the proposed terms to permit a meaningful bid, and that the distribution of the Offering Memorandum was sufficiently widespread and targeted to potential bidders to call forth legitimate bids from entities in the target market."

In its decision, the department stated, however, that "[t]he evidence adduced in this case raises a concern about whether the $2.5 million offer by RTS represents the fair market value of the subject assets. Pursuant to our discussion *supra*, we need not make that determination in this proceeding. The issue of the fair market value of NET's radio utility assets is more appropriately determined within the context of a rate case. Should we find that a higher purchase price could reasonably have been received, NET would be required to account to the ratepayers for this additional value. . . . Accordingly, we shall defer any determination of the fair market value of NET's radio assets until the next general rate investigation conducted by the Department." D.P.U. 88-221/235 at 28-29.

In *New England Tel. & Tel. Co.*, D.P.U. 86-17, the department stated that it "would not be opposed to [the transfer of NET's assets if it] was at fair market value as determined through a competitive bidding process or through an independent appraisal, since such a transfer would eliminate our concerns about the anticompetitive impact and the negative effects upon NET's remaining customers." Wolf claims that D.P.U. 86-17 established the rule "that in a transfer of

assets to an affiliated or unaffiliated company, a utility must obtain fair market value" for the assets. Wolf notes that "[n]owhere in this decision is there a finding that the RTS bid is at fair market value. All the Department says is that it was the result of a 'bona fide' negotiation." Wolf maintains that the "[d]epartment's failure to find that the RTS offer was at fair market value pursuant to its prior decisions requires reversal."

The department argues that, in D.P.U. 86-17, it did not select a standard of "fair market value" in the abstract. Rather, it stated "that approval should be forthcoming 'if the transfer of assets was at fair market value *as determined through a competitive bidding process* . . . '" (emphasis supplied by the department). D.P.U. 86-17 at 16. The department asserts that the "fact that the price was achieved through competitive bidding process suffices to carry NET's burden." As the department notes, D.P.U. 86-17 requires a determination that the bidding process is competitive. In a transfer case, it also is necessary to determine whether an offer represents the fair market value of the subject assets. Of course, if the bidding process, in fact, is competitive, the offer given should represent the fair market value of the assets being sold.

Wolf argues that a transfer at "fair market value" means a sale at the best or highest possible price and that it was error to approve the transfer at RTS's offer of $2.5 million where they were willing to pay at least $3.5 million.[12] Wolf

---

[12]The department, NET, and RTS suggest that Wolf's "willingness" to pay at least $3.5 million for the same assets may have been illusory. Wolf argues that its letter of credit represented a "solid offer of at least $3.5 million" and "was adequately guaranteed . . . [and] as reliable as the $2.5 million from RTS" and showed that RTS's offer did not represent the highest possible offer or the fair market value of the assets. RTS argues that Wolf did not file its letter of credit until three days before the conclusion of the hearings, and more than one year after the agreement between RTS and NET. At that time, RTS had paid a deposit and full payment was guaranteed by a firm with more than ample resources. The department notes that Wolf's "offer" was not subjected to the same scrutiny as the agreement executed by NET and RTS and that the agreement's purchase price did not include a number of additional costs that RTS will

asserts that "even a perfect process could not justify sale of an asset at a price below what a buyer is willing to pay . . . . Even if [Wolf] came from Mars after NET had accepted the RTS offer and so could not conceivably have been located by NET in the offering process, . . . the Department was bound to consider that offer as demonstrating the inadequacy of the RTS price and the NET offering process. The issue here is primarily the adequacy of the price NET obtains, not merely the validity of the process it followed." We do not agree. Nothing in D.P.U. 86-17 required that the sale price be the highest that could possibly be obtained or that the bidding process be perfect. Nothing in D.P.U. 86-17 required the bidding process to remain open indefinitely with no closing date. All that is required is that the RTS's offer represent the "fair" value of the assets as determined by the market during a fair period of time. That a higher price might have been obtained from some other source more than one year later does not render RTS's offer or NET's bidding process unfair or inadequate.

Because the department failed to make the necessary determination of fair market value for the assets, we remand this matter to the single justice for remand to the department

---

pay to NET. As the department notes, the RTS purchase price did not include costs to RTS to obtain billing, collection, and maintenance services from NET for twelve months following the closing date of the sale as well as costs associated with real estate leases with NET and costs of operator services. In its only finding regarding Wolf's willingness to pay $3.5 million, the department referred to Wolf's "bid" and stated that "while not conclusive as the fair market value, [it] does support a finding that a more diligent search might have led to a higher offer." It did not find that the letter constituted an "offer" or a "guarantee" of any kind. It is telling that, at the transfer hearing, Wolf's counsel stated that "it [was] a minimum bid; it [was] not an offer. We were very clear and careful not to make any offers."

for a determination whether RTS's offer represents the fair market value of the radio assets.[13]

*So ordered.*

---

[13]The question whether further evidentiary hearings or nonevidentiary hearings are needed to make this determination is within the department's sole discretion.