MCI TELECOMMUNICATIONS CORPORATION *vs.* DEPARTMENT
OF TELECOMMUNICATIONS & ENERGY; NEW ENGLAND
TELEPHONE & TELEGRAPH COMPANY, intervener.[1]

Suffolk. February 5, 2001. - September 26, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, COWIN, SOSMAN, & CORDY, JJ.

*Telecommunications. Telephone Company. Public Utilities,* Telecommunications, Rate structure. *Administrative Law,* Rate regulation.

In an appeal of a decision of the Department of Telecommunications and Energy interpreting Federal statutory and regulatory provisions, this court accorded deference to the agency's interpretation commensurate with the delegation of decision-making authority to that agency from the Federal Communications Commission. [150-151]

This court concluded that the decision of the Department of Telecommunications and Energy to approve a telecommunication company's elimination of payphone subsidies through reduction of rates other than "exchange access" rates contained no error of law. [151-157]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on July 14, 1998.

The case was reported by *Ireland,* J.

*Matthew B. Pachman,* of the District of Columbia (*Mark A. Berthiaume* with him) for the plaintiff.

*Daniel J. Hammond,* Assistant Attorney General, for the defendant.

*Barbara Anne Sousa* for the intervener.

SOSMAN, J. MCI Telecommunications Corporation (MCI) filed the present petition before a single justice of this court pursuant to G. L. c. 25, § 5, seeking to set aside the final decision, order, and rulings (decision) of the Department of Telecommunications and Energy (department) approving the rate filing of New England Telephone and Telegraph Company, doing business as Bell Atlantic-Massachusetts (Bell Atlantic). Specifically, MCI

---

[1] Doing business as Bell Atlantic-Massachusetts, now known as Verizon Massachusetts.

challenges the department's decision to approve Bell Atlantic's elimination of payphone subsidies through reduction of rates other than "exchange access" rates. MCI contends that Federal regulations mandating the elimination of subsidies for payphone services require Bell Atlantic to identify within its various rates the precise sources of those payphone subsidies and to reduce those specific rates. The department and Bell Atlantic counter that Federal law requires the elimination of any ongoing subsidy, and not the tracing exercise sought by MCI. Considering the matter on reservation and report from the single justice, we conclude that MCI has not demonstrated any error of law in the department's decision, and we therefore order that the decision be affirmed.

1. *Statutory and regulatory background.* MCI's objection to the department's decision stems from its interpretation of 47 U.S.C. § 276 (a) (1) (1994 & Supp. 1999), which mandates that all Bell operating companies[2] eliminate the subsidies that previously supported their payphone services, and its interpretation of the orders of the Federal Communications Commission (FCC) implementing that statutory provision. An understanding of that regulatory framework is necessary to understand the positions and contentions of the parties.

Prior to the enactment of 47 U.S.C. § 276 (a) (1), local exchange carriers (most of which were Bell operating companies) enjoyed a monopoly over the provision of local telephone services within their respective regions, subject to State regulation. For the most part, those local exchange carriers also had a monopoly over the provision of payphone services, with the rates for such payphone services also regulated by each State. Massachusetts, along with some other States, set the price for local payphone calls at a uniform rate (ten cents) that was significantly lower than the cost of providing that service. The local exchange carrier (here, Bell Atlantic) was then allowed to

---

[2]The term "Bell operating company" is defined by reference to a list of named companies (plus their successors and assigns), and that list includes New England Telephone and Telegraph Company. 47 U.S.C. § 153 (4) (A) (1994 & Supp. 1999). The Bell operating companies, which function as local exchange carriers providing local telephone service, were formed following the breakup of the Bell system.

charge higher rates on other services in order to make up for the shortfall on its payphone services.

In the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996), Congress enacted sweeping changes in the telecommunications industry. Among other things, the Act sought to introduce competition in the provision of local telephone services, including payphone services. The long-standing practice of below-cost payphone rates subsidized by other components of telephone service operations, which had operated as a substantial barrier to competition for payphone services, was to end. Specifically, the Act provided that a Bell operating company "shall not subsidize its payphone service directly or indirectly from its telephone exchange service operations or its exchange access operations." 47 U.S.C. § 276 (a) (1). "In order to promote competition among payphone service providers," the Act then authorized the FCC to promulgate regulations that would, inter alia, "discontinue . . . all intrastate and interstate payphone subsidies from basic exchange and exchange access revenues" in favor of a compensation plan that would provide fair compensation for each payphone call. 47 U.S.C. § 276 (b) (1).

On June 6, 1996, the FCC issued a notice of proposed rule making in which it sought comments concerning the implementation of § 276. Matter of Implementation of the Pay Telephone Reclassification & Compensation Provisions of the Telecommunications Act of 1996, 11 F.C.C.R. 6,716 (1996). In that notice, the FCC outlined its proposed method for removing payphone subsidies from interstate charges. *Id.* at par. 51. However, with respect to intrastate charges (which had long been subject to State regulation), the FCC sought comment on "whether the [FCC] should set a deadline and a specific mechanism for elimination of any intrastate subsidies as well, or whether it would be both consistent with the statute as well as preferable from a policy perspective to permit the states to formulate their own mechanisms for achieving this result within a specific time frame." *Id.* at par. 52. The FCC also asked for submission of "state-specific information regarding the intrastate rate elements that recover payphone costs." *Id.*

In response, interested parties submitted comments recom-

mending, inter alia, that due to variation among the States, a "national scheme for removing payphone subsidies from intrastate rates would be "impractical" and that "states should be permitted to formulate mechanisms to remove intrastate costs." Matter of Implementation of the Pay Telephone Reclassification & Compensation Provisions of the Telecommunications Act of 1996, 11 F.C.C.R. 20,541, par. 178 (1996). The FCC then promulgated its order, requiring local exchange carriers to "remove from their intrastate rates any charges that recover the cost of payphones." *Id.* at par. 186. Noting that "[p]arties did not submit state-specific information regarding the intrastate rate elements that recover payphone costs," the FCC ordered that "States must determine the intrastate rates [*sic*] elements that must be removed to eliminate any intrastate subsidies . . . ." *Id.*

2. *Proceedings before the department.* Prior to 1995, Bell Atlantic's rates had been regulated using a traditional "rate of return" rate setting method. Under that method, the department reviewed a utility's costs, determined a reasonable rate of return on investment, and set rates at a level that would generate revenue sufficient to meet reasonable costs plus a reasonable rate of return. See *Hingham* v. *Department of Telecommunications & Energy*, 433 Mass. 198, 203 (2001).

In 1995, however, the department began regulating Bell Atlantic's various rates using a new system referred to as "price cap" methodology. Under that system, the department sets caps on the utility's various rates and allows the utility to retain as profit the difference between those caps and the cost of providing the services.[3] The price cap approach is designed to provide utilities with an incentive to increase efficiency and reduce costs. Price cap methodology allows the original caps to adjust for inflation but, based on the assumption that price cap incentives will cause the utility to reduce its costs, that increase for inflation is reduced by what is referred to as a "productivity offset," expressed as a percentage. P.W. Huber, M.K. Kellogg, & J. Thorne, Federal Telecommunications Law 115, 119 (2d ed.

---

[3]Where, as here, a regulated utility operates in a competitive environment, the department also sets a minimum price floor to prevent anticompetitive pricing.

1999). Having set the original price caps on Bell Atlantic's rates in 1995, the department required Bell Atlantic to make an annual filing reflecting its calculation of the cap adjustments and its proposed rate revisions necessary to comply with those adjusted caps.

In June, 1997, Bell Atlantic submitted its third annual filing for rate review under the price cap methodology. By that time, 47 U.S.C. § 276 (a) (1) had become effective. Thus, in addition to the various adjustments that had to be made to comply with price cap requirements, Bell Atlantic also had to make adjustments to remove from its intrastate rates any and all components that previously had operated as a subsidy of its payphone service, and thereby demonstrate its compliance with the FCC's orders implementing § 276 (a) (1). Bell Atlantic proposed to raise its toll for a local payphone call from ten cents to a then-market rate of twenty-five cents. It calculated the total amount of the preexisting subsidies at $44.1 million, and submitted proposed reductions on rates charged to customers for a variety of intrastate services that would result in a corresponding revenue decrease of $44.1 million. It did not propose to reduce its "exchange access rates" (rates paid by competing long distance service providers who need to "access" the local telephone system at both the initiating and receiving ends of a long distance telephone call) as part of its proposal to eliminate the payphone subsidy.

MCI objected to Bell Atlantic's proposal. MCI contended that the FCC's implementing orders required the identification of the precise rate sources that had previously subsidized Bell Atlantic's payphone services, and that reductions to eliminate the subsidy had to come from those specific sources. It argued that exchange access rates had, at least in part, harbored the payphone subsidy, and that the elimination of the subsidy therefore had to include a reduction in exchange access rates, and not just a reduction in rates charged to telephone service customers.[4] Bell Atlantic countered that "[t]he Company's regulated rate structure does not contain rate elements that were

[4]MCI must pay for access to Bell Atlantic's local telephone exchanges whenever MCI carries a long distance call originating or terminating in a Bell Atlantic local exchange. Thus, Bell Atlantic's proposal did nothing to reduce

designed explicitly to subsidize [payphone] service, and accordingly, it is impossible to identify the specific services that supported [payphone] service," and argued that § 276 (a) (1) required only that the entirety of the subsidy be eliminated, not that it be eliminated from a particular source.

The department agreed with Bell Atlantic's calculation of the total amount of the prior payphone subsidy and accepted Bell Atlantic's calculation that the proposed rate changes would in fact achieve a $44.1 million reduction in revenue from intrastate charges. The department also agreed with Bell Atlantic's interpretation of the statutory mandate, and agreed that the precise sources of Bell Atlantic's prior payphone subsidy could not be identified without a burdensome (and otherwise unnecessary) review of its entire rate structure. Specifically, the department explained its position as follows:

> "[W]e find that neither Section 276 nor the FCC's [orders] require that [local exchange carriers] identify and quantify payphone subsidies by specific rate element or that subsidies be removed by reductions in specific rate elements, including [exchange] access rates. We agree with Bell Atlantic that the FCC gave discretion to state commissions, consistent with individual state ratemaking policies, to determine how best to identify and eliminate payphone subsidies, in those cases where payphone subsidies were not directly attributable to any particular rate elements. . . . The Department, like many other state commissions, had not conducted any prior proceedings that would have directly identified payphone subsidies and attributed those subsidies to specific rate elements, such as [exchange] access. Payphone subsidies have been embedded in Bell Atlantic's rates for decades. Although one can quantify the overall amount of the subsidies, as the Company has done, it is nearly impossible to identify the source of the subsidies without conducting a comprehensive rate structure investigation. We do not read the Act or the FCC's directives as requiring such a time-consuming, resource-intensive investigation. Therefore, we find that

the rates that MCI itself pays. At the same time, MCI competes with Bell Atlantic for customers, and Bell Atlantic's proposed reductions in rates charged to customers would place competitive pressures on MCI.

> Bell Atlantic has complied with federal requirements for removing federal payphone subsidies from intrastate local exchange services and exchange access service rates."
> (Citations omitted.)

Having made that determination, the department approved Bell Atlantic's proposed rate revisions, holding that they satisfied the Federal statutory mandate.[5]

In this appeal, MCI does not dispute the calculation of the dollar amount of Bell Atlantic's payphone subsidy, nor does it dispute that the proposed rate reductions will result in a corresponding decrease in revenues sufficient to account for that subsidy. MCI's sole contention is that § 276 (a) (1) and the FCC's implementing orders require that rate reductions to eliminate payphone subsidies be linked to the specific rates and charges that had historically contained those subsidies. Thus, the department's approval of Bell Atlantic's proposed method of eliminating the subsidies, in the absence of proof that the rates reduced were the same rates that had been inflated to provide past subsidies, is alleged as legal error.

3. *Standard of review.* "A petition under G. L. c. 25, § 5, which raises no constitutional issues requires us to review the department's finding to determine only whether there is an error of law. . . . General Laws c. 25, § 5, allocates to appellants the burden of proving such error. This burden is a heavy one. We give great deference to the department's expertise and experience in areas where the Legislature has delegated to it decision-making authority." (Citations omitted.) *Costello* v. *Department of Pub. Utils.*, 391 Mass. 527, 532-533 (1984). We review such orders narrowly, but not perfunctorily. *Id.* at 533.

Where, as here, the case involves interpretation of a complex statutory and regulatory framework, "[w]e give great deference to the department's expertise and experience in areas where the

---

[5]Although not made expressly a basis for the department's decision, it is undisputed that, at the time of its 1997 filing, Bell Atlantic's exchange access rates had already been reduced to target levels previously established by the department, whereas certain of Bell Atlantic's other rates charged to customers were still above those targets. As such, Bell Atlantic's proposed rate reductions were addressed to rates that were still above target, rather than at exchange access rates (where further reduction would have brought them below target).

Legislature has delegated to it decision making authority." *Stow Mun. Elec. Dep't* v. *Department of Pub. Utils.*, 426 Mass. 341, 344 (1997), quoting *Wolf* v. *Department of Pub. Utils.*, 407 Mass. 363, 367 (1990). We will "accord[] due weight and deference to an agency's reasonable interpretation of a statute within its charge." *Police Comm'r of Boston* v. *Cecil*, 431 Mass. 410, 413 (2000). See *School Comm. of Wellesley* v. *Labor Relations Comm'n*, 376 Mass. 112, 116 (1978); *Massachusetts Elec. Co.* v. *Massachusetts Comm'n Against Discrimination*, 375 Mass. 160, 169-170 (1978); *School Comm. of Springfield* v. *Board of Educ.*, 362 Mass. 417, 442 (1972).

MCI argues that we should show no deference to the department's interpretation in this case because the department was interpreting Federal, not State, statutory and regulatory provisions. See *Orthopaedic Hosp.* v. *Belshe*, 103 F.3d 1491, 1495 (9th Cir. 1997), cert. denied, 522 U.S. 1044 (1998); *Turner* v. *Perales*, 869 F.2d 140, 141 (2d Cir. 1989). Cf. *Tarin* v. *Commissioner of the Div. of Med. Assistance*, 424 Mass. 743, 751 (1997) (deference shown to State agency's interpretation of both Federal and State statutes). However, the Federal regulatory authority (the FCC) expressly determined that the removal of the payphone subsidy from intrastate charges was best left to State regulatory authorities. While the delegation to the department did not come from our own Legislature, there was delegation to the department from the FCC itself. Indeed, the FCC's stated reason for that delegation was that intrastate charges had been subject to varying State regulatory approaches, such that a nationwide approach to removing payphone subsidies from those intrastate rates was impractical. Thus, it was appropriate for State regulatory agencies to determine the methodology for removing payphone subsidies from their intrastate charges. Because implementation of § 276 (a) (1) has, with respect to intrastate charges, been delegated to the department by the FCC, we accord deference to the department's interpretation commensurate with that delegation.

4. *Discussion.* We agree with the department that 47 U.S.C. § 276 (a) (1) evinces Congress's intent to remove the competitive barriers imposed by local exchange carriers' subsidies for payphone services. Those subsidies had long operated to thwart

competition in the market for payphone services. It was the existence of that barrier to competition — not the sources of the subsidies themselves — that concerned Congress. In the statute, Congress identified the purpose of these provisions: "to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public." 47 U.S.C. § 276 (b) (1). See S. Conf. Rep. No. 104-230, 104th Cong., 2d Sess. 157-158 (1996) (legislation operates to prohibit local exchange carriers "from cross-subsidizing and from preferring or discriminating in favor of their own payphone operations").

The statute itself merely prohibits Bell operating companies from subsidizing payphone operations. After the effective date, a Bell operating company "shall not subsidize its payphone service directly or indirectly from its telephone exchange services operations or its exchange access operations." 47 U.S.C. § 276 (a) (1). The statutory language contains no suggestion that the precise dollars comprising the subsidies must be traced back to the exact inflated rate(s) from which they sprang. Indeed, it says nothing as to how past subsidies are to be eliminated. It merely mandates that no subsidy, direct or indirect, may be used in the future, § 276 (a) (1), and then directs the FCC to prescribe rules to "discontinue" the payphone subsidy "from basic exchange and exchange access revenues," § 276 (b) (1).[6] The focus was on removing these subsidies from "revenues," not on reduction of rates for those customers or entities that had, historically, paid the payphone subsidies.

The FCC similarly described its task as one of ensuring that the competitive barriers erected by way of payphone subsidies be removed:

"In this proceeding we advance the twin goals of Section 276 of the Act of 'promot[ing] competition among payphone service providers and promot[ing] the wide-

---

[6]The Conference Committee report explains that the FCC's task is "to adopt rules that eliminate all discrimination between [local exchange carriers] and independent payphones and all subsidies or cost recovery for [local exchange carrier] payphones from regulated interstate or intrastate exchange or exchange access revenue." S. Conf. Rep. No. 104-230, *supra* at 158.

spread deployment of payphone services to the benefit of the general public . . . .' To this end, we seek to eliminate those regulatory constraints that inhibit the ability both to enter and exit the payphone marketplace, and to compete for the right to provide services to customers through payphones. . . .

"Congress has directed us to take certain actions to effectuate its goals in the payphone area including the removal of subsidy schemes, providing for nondiscriminatory access to bottleneck facilities, ensuring fair competition for all calls from payphones, and allowing all competitors equal opportunity to compete for essential aspects of the payphone business . . . . Unfortunately, various barriers — regulatory, structural, economic, and technological — stand in the way of having a fully competitive market providing payphone services. . . . Regulatory restrictions on the placement of payphones, and existing subsidies from other telecommunication services available to certain competitors but not others are also examples of regulatory inefficiencies affecting competition and the widespread deployment of payphones."

Matter of Implementation of the Pay Telephone Reclassification & Compensation Provisions of the Telecommunications Act of 1996, 11 F.C.C.R. 20,541, pars. 2-3 (1996). The focus was the fostering of fair competition in the provision of payphone service, not the remediation of any other form of unfairness to customers that had resulted from the allocation of payphone subsidies in the past. Nothing in the statute, its legislative history, or the FCC's proceedings identified the burden of paying the subsidies as the problem to be remedied. Rather, what was to be remedied was the effect those subsidies had on competitors.

The specific directive of the FCC was that local exchange carriers "remove from their intrastate rates any charges that recover the cost of payphones." *Id.* at par. 186. Revised rates reflecting the elimination of payphone subsidies were to be effective by no later than April 15, 1997. *Id.* Because the FCC itself did not have "state-specific information regarding the intrastate rate elements that recover payphone costs," it ordered that "States must determine the intrastate rates [*sic*] elements that must be removed to eliminate any intrastate subsidies within this time frame." *Id.*

MCI reads into the FCC's use of the phrase, "determine the intrastate rate[] elements that must be removed," *id.*, a requirement that the past subsidies be traced to and then eliminated from their precise historical sources. The FCC's directive is arguably ambiguous on this point, but we discern no error in the department's decision that there is, in context, no need for or intent to impose such an exercise. Rather, the thrust of the FCC mandate to the States is that they ensure that no form of subsidy is provided to a local exchange carrier's payphone services that would give that carrier an unfair advantage in the competitive payphone market. It was important to ensure that no local exchange carrier maintained the benefit of any form or degree of subsidy as it faced that new competitive environment. Precisely how that subsidization was to be prevented was what the FCC left to the States.[7] The FCC's directive that States "determine the intrastate rate[] elements that must be removed,"

---

[7]Regulatory agencies in other States have also declined to adopt MCI's strict interpretation of the FCC's mandate, a fact that tends to support the reasonableness of the department's interpretation. See *Consumers Org. for Fair Energy Equality, Inc.* v. *Department of Pub. Utils.*, 368 Mass. 599, 607-608 (1975) (noting interpretation in other regulatory jurisdictions consistent with department's interpretation). MCI points to no decision from any other jurisdiction that interprets § 276 (a) (1) and the FCC's orders in the manner MCI proposes.

In Vermont, the public service board rejected MCI's assertion, identical to that made here, that exchange access charges had contributed to the payphone subsidies, and that § 276 (a) (1) and the FCC's orders therefore mandated a reduction in exchange access rates. *Tariff Filing of New England Tel. & Tel. Co. Requesting an Increase in the Local Coin Rate for Pay Telephones*, Vermont Public Service Board, No. 5940, at 12-14 (Oct. 7, 1997). As here, that agency allowed the local exchange carrier to eliminate the subsidy by reducing revenues from charges to its customers, without any reduction in exchange access rates. *Id.* at 13-14. The board determined that its "reclassification of payphone assets to unregulated status and the elimination of payphone related costs from the intrastate books" would ensure that no subsidy remained, "irrespective of the specific rate elements reduced." *Id.* at 13. The board noted that the FCC had not specified what intrastate rate elements had to be reduced and had instead left that determination to the discretion of each State. *Id.* Where the local exchange carrier's "existing rate design does not specifically delineate subsidies," it would be "impossible" to determine the sources of the subsidy "absent a comprehensive rate design." *Id.* Where "[n]othing in the Act or FCC Orders requires such an undertaking," the board declined to perform that exercise. *Id.*

The Florida Public Service Commission similarly declined to perform an exhaustive analysis tracing payphone subsidy dollars. *In re Establishment of*

*id.*, adopted the FCC's earlier suggestion that it "permit the states to formulate their own mechanisms" for eliminating intrastate subsidies. *Matter of Implementation of the Pay Tel. Reclassification & Compensation Provisions of the Telecommunications Act of 1996*, 11 F.C.C.R. 6,716, par. 52 (1996). The rigid interpretation that MCI now seeks to impose on the FCC order is inconsistent with the way the FCC itself characterized that order.

Here, MCI points to no ongoing subsidization of Bell Atlantic's payphone operations, and does not dispute that Bell Atlantic's payphone charges are now at market rates. Revenues from other operations have been reduced by the amount that previously subsidized Bell Atlantic's payphone operations, and Bell Atlantic no longer has any unfair competitive advantage in the payphone market stemming from any direct or indirect subsidy of its payphone services. MCI's disappointment that Bell Atlantic's rate reductions were not made in ways that would be more advantageous to MCI (see note 4, *supra*) was not what Congress intended to remedy when it enacted 47 U.S.C. § 276.

We similarly find no error in the department's finding that the tracing of former subsidy dollars back to their precise rate source(s) is labor intensive bordering on the "impossible" for a provider that has been subject to price cap methodology for several years. Price cap rate setting, once instituted, is not dependent on a detailed analysis of the utility's costs. Rather, the caps have been set, and the utility profits from its ability to keep costs as far below those caps as it can. When Bell Atlantic became subject to price caps in 1995, there was no explicit al-

---

*Intrastate Implementation Requirements Governing Federally Mandated Deregulation of Local Exch. Co. Payphones*, 97 Fla. Pub. Serv. Comm'n 10:535 (Oct. 22, 1997). Indeed, in that proceeding, MCI acknowledged that such an exercise was not possible. *Id.* at 546 ("the intrastate payphone subsidies cannot be traced to any particular service"). Instead, the Florida commission identified a list of rates that were "priced significantly above cost" such that they "produce substantial contribution" for the local exchange carrier (and hence were at least potential sources of contribution to the prior subsidy), and allowed the carrier to select one or more of those rates for reduction to eliminate the payphone subsidy. *Id.* The carrier chose to reduce rates from only one of the identified rates that had been substantially above cost. *Id.* The commission did not require the carrier to spread the rate reduction across all of the categories that could, potentially, have contributed to the subsidy. *Id.*

location for the payphone subsidy.[8] Where Bell Atlantic has, under the incentives provided by price cap methodology, reduced its costs for particular components of its operations and thus made a greater profit from those components, one cannot simply assume that those greater profits are a "payphone subsidy." Indeed, it would be contrary to the very premise of price cap methodology, which relies on precisely these incentives to cut costs and enhance efficiency, to penalize a utility for those improvements by labeling the resulting profits as a "payphone subsidy" and then reducing those rates. The application of MCI's proposed method would be unnecessarily cumbersome, as it is inappropriate in a price cap system, and would do nothing to eradicate a subsidy that has already been eradicated completely.[9]

Finally, we see no arbitrariness or capriciousness in the department's approval of Bell Atlantic's choice of which rates to reduce. The exchange access rates that MCI would like to see reduced under the rubric of eliminating the payphone subsidy have already been reduced to the target levels identified by the department in prior proceedings. By comparison, certain other rates charged to Bell Atlantic customers are still above the identified target rates. It is not arbitrary or capricious for the department to have approved a reduction in rates that have yet to come down to target levels, rather than leave those rates above target and reduce the exchange access rates to levels lower than their targets. Confronted with the need to reduce Bell Atlantic's revenues by $44.1 million (and thereby eliminate

[8]By comparison, in a standard cost plus rate of return rate setting procedure, there would be a detailed evaluation of costs, and any shortfall from the below cost pricing of payphone service would have to have been put somewhere else in the calculations. While the exercise would be complex, the allocation of that shortfall presumably could be traced. Following the shift to price cap methodology, however, that tracing can no longer be performed from existing regulatory documentation. It was in recognition of precisely these variations in rate setting methods that the FCC decided to leave to the States the task of eliminating payphone subsidies from intrastate charges. See Matter of Implementation of the Pay Telephone Reclassification & Compensation Provisions of the Telecommunications Act of 1996, 11 F.C.C.R. 20,541, par. 186 (1996).

[9]The practical impossibility of performing the study that MCI's approach would necessitate was a factor in other regulatory agencies' rejection of such an approach. See note 7, *supra*.

any remaining subsidy of Bell Atlantic's payphone operations), Bell Atlantic did so by reducing those rates that the department had previously identified as higher than desirable. We find no error in the department's approval of those reductions.

5. *Conclusion.* The case is remanded to the county court where judgment should be entered affirming the department's order approving the revisions to tariff filed by Bell Atlantic.

*So ordered.*