166                                    461 Mass. 166 (2011)

Alliance to Protect Nantucket Sound, Inc. *v.* Department of Public Utilities (No. 1).

ALLIANCE TO PROTECT NANTUCKET SOUND, INC., & others[1] *vs.*
DEPARTMENT OF PUBLIC UTILITIES & others[2] (No. 1).

Suffolk. September 8, 2011. - December 28, 2011.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Department of Public Utilities. Electric Company. Electricity. Renewable
Energy. Public Utilities,* Electric company. *Constitutional Law,* Commerce
clause, Interstate commerce. *Interstate Commerce. Administrative Law,*
Judicial review, Findings, Substantial evidence.

The approval of the Department of Public Utilities (department) of a power
purchase agreement (agreement) between electricity distribution companies
and an in-State renewable energy generation facility did not violate the
commerce clause of the United States Constitution, where the distribution
companies demonstrated that they entered into the agreement for reasons
unrelated to a suspended geographic limitation provision contained in St.
2008, c. 169, § 83 [172-175]; further, the department acted with reasoned
consistency in allowing the distribution companies to move forward with
the approval process for the agreement, which was entered into while the
geographic limitation was in effect [175-176].
The record of a proceeding before the Department of Public Utilities (depart-
ment) for review and approval of a power purchase agreement (agreement)
contained sufficient evidence for a reasonable person to conclude that the
agreement was a cost effective mechanism for procuring renewable energy
on a long-term basis, i.e., that the benefits of the agreement outweighed its
costs [176-180]; further, there was clearly sufficient evidence on which the
department could conclude that approval of the agreement was in the
public interest, i.e., that the special benefits of the agreement exceeded
those of other renewable energy resources [180-181].
The Department of Public Utilities (department) reasonably construed St.
2008, c. 169, § 83, to mean that electricity distribution companies were
permitted to solicit a proposal for a long-term renewable energy agreement
(agreement) from a single renewable energy developer and not through
competitive bidding, regardless of the more general, older provisions of
G. L. c. 164, § 1B (*d*), that do so require [181-185]; further, the depart-
ment correctly concluded that the agreement was, in the circumstances, not
subject to a cap on its size [185-186].

[1]Associated Industries of Massachusetts (AIM), New England Power Gen-
erators Association (NEPGA), and TransCanada Power Marketing Ltd.

[2]Massachusetts Electric Company and Nantucket Electric Company, each
doing business as National Grid; Cape Wind Associates, LLC; Conservation
Law Foundation; Clean Power Now; Natural Resources Defense Council; and
Union of Concerned Scientists, interveners on appeal.

461 Mass. 166 (2011)                    167

Alliance to Protect Nantucket Sound, Inc. *v.* Department of Public Utilities (No. 1).

In a proceeding before the Department of Public Utilities (department) for review and approval of a power purchase agreement (agreement) between electricity distribution companies and a renewable energy generator, the department acted within its statutory authority in approving a method for recovering costs from all distribution customers [186-188] and did not err, as a matter of law, by requiring that the agreement facilitate financing of a renewable energy generation source [188-189].

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on December 13, 2010.

The case was reported by *Botsford, J.*

*Evan T. Lawson (Glenn S. Benson,* of the District of Columbia, *& Michele A. Hunton* with him) for Alliance to Protect Nantucket Sound, Inc.

*Richard A. Kanoff* for New England Power Generators Association, Inc.

*Robert A. Rio (Robert R. Ruddock* with him) for Associated Industries of Massachusetts.

*Kenneth W. Salinger,* Assistant Attorney General, for the defendant.

*David S. Rosenzweig (Erika J. Hafner* with him) for Massachusetts Electric Company & others.

*Robert M. Buchanan, Jr., & Nellie E. Staley,* for TransCanada Power Marketing Ltd., submitted a brief.

*Susan M. Reid, Matthew F. Pawa, Katherine Kennedy, & Brandi Colander,* for Conservation Law Foundation & others, submitted a brief.

BOTSFORD, J. This matter comes before us on a reservation and report by a single justice of this court of a decision and final order of the Department of Public Utilities (department) approving a power purchase agreement (PPA or contract) that Massachusetts Electric Company and Nantucket Electric Company, each doing business as National Grid (collectively, National Grid) entered into with Cape Wind Associates, LLC (Cape Wind). The four parties bringing this appeal — the Alliance to Protect Nantucket Sound, Inc. (Alliance); Associated Industries of Massachusetts (AIM); New England Power Generators Association (NEPGA); and TransCanada Power Marketing Ltd. (TransCanada) — were all interveners in the department's

proceeding.[3] They claim that the PPA violates the commerce clause of the United States Constitution; the department improperly found that the PPA was cost effective and in the public interest; the contract should have been solicited through competitive bidding and subject to a cap on its size; and the department erroneously both approved a method for recovering costs from all distribution customers and required that the contract facilitate financing of a renewable energy generation source. The interveners seek reversal of the department's decision and order, and a remand to the department for further proceedings. The single justice on remand will affirm the department's decision.

1. *Background.*[4] National Grid is a distribution company[5] that provides electricity to Massachusetts customers. Cape Wind is building a wind-powered renewable energy generation facility in Federal waters adjacent to the Commonwealth that are part of Nantucket Sound. National Grid and Cape Wind negotiated and entered into the PPA under the Green Communities Act, St. 2008, c. 169 (GCA, or Act). The Governor signed the GCA, with an emergency preamble, into law on July 2, 2008. The stated purpose of the GCA is to "provide forthwith for renewable and alternative energy and energy efficiency in the [C]ommonwealth." St. 2008, c. 169, emergency preamble. At issue in this case is § 83 of the GCA, St. 2008, c. 169, § 83 (§ 83), which requires electricity distribution companies to seek proposals from renewable energy developers twice in a five-year period beginning on July 1, 2009, and, if reasonable proposals are received, enter into long-term PPAs to facilitate the financing of renewable energy generation facilities. St. 2008, c. 169, § 83,

---

[3]We refer to the parties bringing this appeal collectively as the interveners, because each of them intervened in the proceeding below before the Department of Public Utilities (department).

[4]The facts recited here are primarily from the decision and order of the department in National Grid, D.P.U. 10-54 (2010) (D.P.U. 10-54), the proceeding from which these appeals were taken, and the record of that proceeding; some facts are from the department's order in another proceeding, National Grid, D.P.U. 09-138 (2009) (D.P.U. 09-138), which approved National Grid's requests to enter into individual negotiations with Cape Wind Associates, LLC (Cape Wind).

[5]A "[d]istribution company" is defined in G. L. c. 164, § 1, as "a company engaging in the distribution of electricity or owning, operating or controlling distribution facilities."

461 Mass. 166 (2011)                                   169

Alliance to Protect Nantucket Sound, Inc. *v.* Department of Public Utilities (No. 1).

first and second pars. As enacted, the GCA contains a provision requiring the renewable energy facilities to be located within the Commonwealth, including State and adjacent Federal waters (geographic limitation provision). St. 2008, c. 169, § 83, first par.[6] Distribution companies must consult with the Department of Energy Resources (DOER) regarding their proposed method of soliciting and executing these long-term contracts. The method, as well as the resulting contracts, are also subject to the department's review and approval. St. 2008, c. 169, § 83, first and second pars.

In evaluating a PPA proposed under § 83, the department must consider its costs and benefits, and may only approve the contract on a finding that it is a "cost effective mechanism for procuring renewable energy on a long-term basis." St. 2008, c. 169, § 83, third par. The renewable energy generation source that is the subject of the PPA must have a commercial operation date on or after January 1, 2008, and be found to enhance electricity reliability within the Commonwealth and create additional employment in the Commonwealth, where feasible. *Id.* The GCA does not require that distribution companies enter into long-term PPAs with renewable energy developers for more than three per cent of the demand from all distribution customers within their service area. St. 2008, c. 169, § 83, fourth par.

Distribution companies entering into PPAs under § 83 are entitled to resell the renewable energy purchased pursuant to those contracts to their customers and use the renewable energy credits (RECs) obtained to meet the "renewable energy portfolio standard" (RPS) requirements separately established by G. L. c. 25A, § 11F (§ 11F).[7] Alternatively, distribution companies

---

[6]The provision in the first paragraph of St. 2008, c. 169, § 83 (§ 83), limiting the location of renewable energy generation facilities to Massachusetts and adjacent Federal waters (geographic limitation provision) is the focus of the interveners' commerce clause argument discussed *infra*. An additional provision, requiring that the renewable energy generation facilities create additional employment in the Commonwealth "where feasible," is also included in § 83. St. 2008, c. 169, § 83, third par. However, the substance of the interveners' commerce clause argument appears to address the geographic limitation provision in the first paragraph.

[7]The renewable energy portfolio standard (RPS) requirements obligate all electricity suppliers who sell to end-use customers to obtain a certain percentage of their power annually from designated renewable energy generating sources. G. L. c. 25A, § 11F (§ 11F). See note 18, *infra*.

may sell the renewable energy into the wholesale spot market and sell the RECs by competitive bidding. St. 2008, c. 169, § 83, fifth par. The GCA describes a reconciliation process by which companies that choose the second, competitive bidding, option may recover the cost of the renewable energy purchased pursuant to a PPA, St. 2008, c. 169, § 83, sixth par., but the Act does not prescribe the methodology for cost recovery under the first, resell to customers, option. Finally, § 83 states that if any provision of the section is "subject to a judicial challenge," the department is entitled to suspend the applicability of the challenged provision pending the outcome of the judicial proceeding, and to issue any necessary orders to ensure that the unchallenged sections of the Act remain in effect. St. 2008, c. 169, § 83, tenth par.

On December 3, 2009, pursuant to § 83, first and second pars., National Grid requested approval from the department to conduct individual negotiations with Cape Wind for long-term PPAs. The department approved the proposed solicitation process on December 29, 2009. National Grid, D.P.U. 09-138, at 13 (2009) (D.P.U. 09-138). After conducting these negotiations, on May 7, 2010, National Grid and Cape Wind executed two PPAs, referred to by the parties as PPA-1 and PPA-2. PPA-1, with a contract term of fifteen years, calls for National Grid to purchase fifty per cent of the energy, capacity, and RECs produced by the Cape Wind facility, up to a maximum of 234 megawatts (MWs). This amount equals approximately 3.5 per cent of National Grid's total distribution load as measured in 2008. PPA-1 is to last for fifteen years from the commercial operation date of the new generation facility.[8] PPA-2, for the purchase of the other fifty per cent of the Cape Wind output, is nearly identical to PPA-1, except that, as drafted, it is intended to be assigned by National Grid to another purchaser.

On April 16, 2010, TransCanada filed suit in the United States District Court for the District of Massachusetts, alleging in principal part that the provision in § 83 requiring distribution companies to contract with companies engaged in renewable energy generation within Massachusetts or adjacent Federal waters was unconstitutional because it discriminated against

---

[8]The commercial operation date is "the date that all phases of the facility are substantially complete and capable of regular commercial operation."

461 Mass. 166 (2011)                                    171

Alliance to Protect Nantucket Sound, Inc. *v.* Department of Public Utilities (No. 1).

out-of-State generators in violation of the commerce clause. In response to this claim, on June 9, 2010, the department exercised its power under § 83, tenth par., to suspend the applicability of the sections of § 83 that were alleged to discriminate against interstate commerce. It issued an order, D.P.U. 10-58 (2010) (D.P.U. 10-58), that removed the words "within the jurisdictional boundaries of the commonwealth, including state waters, or in adjacent federal waters" from § 83, first par. D.P.U. 10-58 at 5. The department's order also removed the words "within the Commonwealth of Massachusetts, its waters, and adjacent federal waters" from its regulations at 220 Code Mass. Regs. § 17.01(1) (2009) and "in the Commonwealth of Massachusetts" from 220 Code Mass. Regs. § 17.05(1)(c)(4) (2009). *Id.*

Approximately one month before the department's suspension order, on May 10, 2010, National Grid filed PPA-1 and PPA-2 with the department for approval. The department docketed the matter as D.P.U. 10-54 and held public hearings on June 16, 21, and 22, 2010. The Attorney General intervened in the proceeding, as did eighteen other parties, including each of the parties bringing this appeal. The parties provided written testimony, and the department held thirteen days of evidentiary hearings between September 7 and 24, 2010. In total, the administrative record contains 838 exhibits and twenty responses to record requests. On November 22, 2010, the department issued its decision approving PPA-1 and denying approval of PPA-2. The interveners each appealed separately from the department's decision approving PPA-1 pursuant to G. L. c. 25, § 5.[9] A single justice consolidated the various appeals and reserved and reported them to this court without decision.

2. *Discussion.* Review of the department's decision is governed by G. L. c. 25, § 5. "The burden of proof is on the appealing part[ies] to show that the order appealed from is invalid, and we have observed that this burden is heavy. . . . Moreover, we give deference to the department's expertise and experience in areas where the Legislature has delegated to it decision-making authority, pursuant to G. L. c. 30A, § 14." *DSCI Corp.* v. *Department of Telecomm. & Energy*, 449 Mass. 597, 603

---

[9]Neither National Grid nor any other party has appealed from the department's decision to deny approval of the second power purchase agreement (PPA-2).

(2007), quoting *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 867-868 (1997). We consider separately below each claim raised by the interveners.[10]

a. *Dormant commerce clause.* The Alliance and TransCanada[11] argue that the geographic limitation provision in the first paragraph of § 83 unconstitutionally discriminates against out-of-State renewable energy generators and favors in-State genera-tors, in violation of the commerce clause.[12] The challenged provision by its terms obligates distribution companies to enter contracts with renewable energy facilities "within the jurisdic-tional boundaries of the commonwealth, including state waters, or in adjacent federal waters." St. 2008, c. 169, § 83, first par. However, because the department suspended the geographic limitation provision before conducting its review of PPA-1, we need not determine the constitutionality of the provision itself. This court "do[es] not decide constitutional questions unless they must necessarily be reached." *Commonwealth* v. *Paasche*, 391 Mass. 18, 21 (1984). See *Lockhart* v. *Attorney Gen.*, 390 Mass. 780, 784 (1984) (referring to "long tradition of not un-necessarily deciding constitutional questions").

The interveners also contend, however, that the negotiation of PPA-1 between National Grid and Cape Wind, which took place while the geographic limitation provision was still in effect, "tainted" the contracting process and the department's approval of PPA-1 in violation of the commerce clause[13]; they further

_____

[10]Although the interveners have each advanced different arguments in their briefs, for the most part, they have joined each other's arguments.

[11]AIM joins this argument.

[12]The commerce clause of the United States Constitution gives Congress the power to regulate commerce among the States. Art. I, § 8, cl. 3. "The United States Supreme Court has consistently held that the commerce clause includes 'a further, negative command, known as the dormant Commerce Clause.' " *Capital One Bank* v. *Commissioner of Revenue*, 453 Mass. 1, 9-10, cert. denied, 129 S. Ct. 2827 (2009), quoting *Oklahoma Tax Comm'n* v. *Jef-ferson Lines, Inc.*, 514 U.S. 175, 179 (1995). The dormant commerce clause has been interpreted to prohibit " 'differential treatment of in-[S]tate and out-of-[S]tate economic interests that benefits the former and burdens the latter,' as opposed to [S]tate laws that 'regulate[ ] evenhandedly with only incidental effects on interstate commerce.' " *Family Winemakers of Cal.* v. *Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010), quoting *Oregon Waste Sys., Inc.* v. *Department of Envtl. Quality of Or.*, 511 U.S. 93, 99 (1994).

[13]The Alliance has not alleged that it or any of its members have been

461 Mass. 166 (2011)                                              173

Alliance to Protect Nantucket Sound, Inc. *v.* Department of Public Utilities (No. 1).

contend that the department's conclusion that National Grid entered into the contract with Cape Wind for reasons wholly independent of § 83's geographic limitation provision lacked evidentiary support. The interveners cite *St. Joseph Stock Yards Co.* v. *United States*, 298 U.S. 38, 52 (1936), and *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 371 Mass. 67, 71 (1976), two cases involving allegations of unconstitutional confiscation, for the proposition that we must conduct an independent review of law and fact as to the claimed constitutional violation. The department responds that an independent review of law and fact is only used in confiscation cases, and therefore we should apply the deferential standard of review set forth in G. L. c. 30A, § 14 (7). See *id.* ("So far as unconstitutional confiscation is claimed, the Company is entitled to an independent judicial review as to both law and fact; otherwise the standard of review is governed by G. L. c. 30A . . ."); *Opinion of the Justices*, 328 Mass. 679, 686-687 (1952). We need not resolve this dispute, because even if we apply the standard of independent review, we find no violation of the commerce clause.[14]

In D.P.U. 10-58, the department's proceeding where it ordered the suspension of the geographic limitation, the department stated that it would require National Grid to show, as part of the approval proceeding for its PPA with Cape Wind (D.P.U. 10-54), "whether and how it complies or will comply with this Order [i.e., the order suspending the geographic limitation] and the accompanying emergency regulations." D.P.U. 10-58 at 6. In response, National Grid submitted testimony and exhibits in D.P.U. 10-54 demonstrating that it had not based its decision to enter individual negotiations with Cape Wind on the now-suspended geographic limitation. The Attorney General, the Alli-

harmed in their ability to compete for § 83 contracts by the claimed infringement of the commerce clause. However, because TransCanada has alleged such harm, we consider the claim.

[14] An independent review of fact "does not include the [department's] subsidiary findings, but extends only to the [department's] ultimate findings and conclusions." *Workers' Compensation Rating & Inspection Bur. of Mass.* v. *Commissioner of Ins.*, 391 Mass. 238, 245 n.5 (1984), quoting *Massachusetts Auto. Rating & Acc. Prevention Bur.* v. *Commissioner of Ins.*, 389 Mass. 824, 846 (1983). See *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 375 Mass. 571, 574 (1978) (subsidiary departmental findings are reviewed under deferential standards set forth in G. L. c. 30A, § 14 [7]).

174                                    461 Mass. 166 (2011)

Alliance to Protect Nantucket Sound, Inc. *v.* Department of Public Utilities (No. 1).

ance, AIM, and NEPGA each cross-examined National Grid's three witnesses. Based on the record, the department ultimately found that National Grid demonstrated that it had complied with the new, nongeographically limited statute and regulations in its negotiations with Cape Wind.

Our independent review of the department's ultimate findings leads us to conclude that National Grid entered into PPA-1 for reasons unrelated to the geographic limitation provision, and therefore the department's approval of PPA-1 did not violate the commerce clause. The record contains testimony from National Grid officials who were involved in the PPA-1 negotiations concerning the reasons for entering the contract, none of which was related to the geographic limitation of § 83.[15] The record also indicates that National Grid commissioned an analysis of renewable energy supply and demand throughout New England, New York, and Canada (Dr. Susan Tierney's analysis), rather than focusing exclusively on the Commonwealth. National Grid was aware as well of pricing of other renewable energy sources through publicly available information and internal analyses of Deepwater Wind, LLC's project in Rhode Island. If the geographic limitation provision did exert pressure on National Grid to contract with an in-State source when it would have preferred an out-of-State source, National Grid could have withdrawn its petition for approval of PPA-1 when the geographic limitation was lifted. Instead, the record indicates that National Grid con-

---

[15]For example, Madison N. Milhous, Jr., director of wholesale market relations for energy portfolio management and one of the negotiators of the Cape Wind contract, testified that "National Grid pursued negotiations with Cape Wind because the timing (including advanced permitting status), technology, location and scale of the project presented one of the best long-term options for meeting the renewable generation goals of the Commonwealth and the region in a cost effective manner." Richard A. Rapp, Jr., senior vice-president for energy portfolio management, explained, "Locationally this project is good because of its ability to deliver into areas where power is needed" and "we did not see any other projects, whether in or out of state, that we thought [were] a better project for our portfolio than this one."

We have carefully reviewed the claims of the Alliance and TransCanada that Milhous and Rapp conceded in other parts of their testimony that National Grid did not know the price of any out-of-State alternatives and essentially negotiated the PPAs with the geographical limitation provision in mind. We do not find the record ultimately supports these claims; at best there is some ambiguity in the witnesses' testimony that the department was entitled to resolve as it did.

tinued to advocate for approval of its privately negotiated contract with Cape Wind, which it perceived to be the best option available either in-State or out-of-State. The constitutional challenge advanced by the Alliance and TransCanada fails.

The Alliance next claims that the department did not act with "reasoned consistency" in allowing National Grid to move forward with the approval process for PPA-1, while requiring NSTAR Electric Company (NSTAR) to reopen the request for proposals (RFP) that was issued while the geographic limitation was in effect.[16] It argues that NSTAR also should have been given an opportunity to demonstrate whether it had complied with D.P.U. 10-58 in its solicitation process. The argument fails. "The requirement of 'reasoned consistency' does not mean that an agency 'may never deviate from its original position,' but rather means only 'that any change from an established pattern of conduct must be explained.' " *Tofias* v. *Energy Facilities Siting Bd.*, 435 Mass. 340, 349 (2001), quoting *Robinson* v. *Department of Pub. Utils.*, 416 Mass. 668, 673 (1993). The department provided a valid explanation for its decision to treat the two petitions differently: National Grid and NSTAR used different solicitation methods. The original RFP, issued January 15, 2010, sought bids from renewable energy generation sources that met the requirements of § 83 and the department's original implementing regulations, both of which at the time included

---

[16]On January 15, 2010, after receiving approval from the department and in consultation with the Department of Energy Resources (DOER), four distribution companies servicing Massachusetts customers issued a joint request for proposals (RFP) seeking bids from renewable energy generators: Fitchburg Gas and Electric Light Company, National Grid, NSTAR Electric Company, and Western Massachusetts Electric Company. D.P.U. 10-58 at 2. When the geographic limitation provision in § 83 was suspended on June 9, 2010, the department ordered the distribution companies to explain how they intended to comply with the terms of the suspending order and associated emergency regulations that removed all provisions in the original regulations intended to implement the geographic limitation provision. *Id.* at 6. The department also ordered the companies to reopen the RFP for a reasonable period of time so that out-of-State generation sources could submit proposals. *Id.* Nevertheless, on July 2, 2010, NSTAR filed three petitions for approval of contracts solicited under the original RFP, before a revised RFP that complied with the emergency regulations had been approved or issued. NSTAR Elec. Co., D.P.U. 10-71, 10-72, 10-73 at 1 (2010). The department dismissed each of the petitions without prejudice because NSTAR had not demonstrated compliance with the emergency regulations. *Id.* at 6-7.

the later-suspended geographic limitation. The RFP, therefore, was explicitly limited to in-State sources. National Grid, by contrast, received departmental permission to solicit a proposal from Cape Wind through individual negotiations. There was no explicit indication that National Grid limited its search for a contracting partner to in-State sources.

b. *Cost effectiveness.* When determining whether to approve long-term PPAs, § 83 directs the department to "take into consideration both the potential costs and benefits of such contracts, and [to] approve a contract only upon a finding that it is a cost effective mechanism for procuring renewable energy on a long-term basis." St. 2008, c. 169, § 83, third par. The contract must be cost effective "over the term of the contract." *Id.* Because § 83 does not define the term "cost effective," the department solicited input from the various parties as to the term's meaning, and ultimately concluded in its decision that "cost effective," in the context of § 83, does not simply mean "least cost." Rather, an analysis of cost effectiveness must consider "all costs and benefits associated with [the PPA], including the non-price benefits that are difficult to quantify, and including costs and benefits of complying with existing and reasonably anticipated future federal and state environmental requirements." D.P.U. 10-54 at 71. The department ultimately found that PPA-1 was cost effective because "the expected benefits [both quantified and unquantified] of PPA-1 to National Grid customers exceed the expected costs to National Grid customers." *Id.* at 215.

To begin its cost effectiveness analysis, the department calculated the likely contract costs in four different scenarios, ranging from low cost to high cost, and concluded that the moderate low-cost and moderate high-cost scenarios were most likely to occur, meaning that PPA-1 would likely cost between $1.6 and $1.8 billion in net present value terms. Out of three independent market benefits forecasts offered by the parties, the department chose to rely on the forecast that it found made the most reasonable underlying assumptions. The department also considered the benefits of price suppression effects[17] arising

---

[17]Price suppression effects are "the reduction in wholesale energy market clearing prices that results from the addition of low-cost generation resources to those markets." D.P.U. 10-54 at 108.

from the additional supply of energy in the market under PPA-1, using a study submitted by National Grid, but declined to go as far as National Grid had requested in considering additional price suppression effects from the remaining output of the Cape Wind facility. The department's analysis then turned to PPA-1's nonquantified benefits, such as improving National Grid's compliance with statutory RPS under § 11F,[18] and with the requirements of the Global Warming Solutions Act, St. 2008, c. 298 (GWSA).[19] It found that other benefits of the PPA included enhanced electricity reliability in the system due to the Cape Wind facility's ability to supply power to the electrical grid at a location that is near a very large concentration of customers. It also determined that PPA-1 will moderate system peak load, meaning that it will provide more power at times when consumers are using more electricity.[20] When these nonquantified benefits are combined, the department concluded that their magnitude would more than compensate for the $420 million to $695 million gap between the quantified benefits of PPA-1 and its costs.

Both TransCanada and the Alliance argue the department's finding that PPA-1 is cost effective is unsupported by substantial evidence.[21] Substantial evidence is evidence that "a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6). Any evidence in the record that is at odds with the department's conclusion must be carefully scrutinized, but due weight also must be given to the department's "experience, technical competence and specialized knowledge." *DSCI Corp.*

---

[18]Section 11F provides that an increasing portion of the energy provided by retail suppliers must be from renewable energy generating sources. G. L. c. 25A, § 11F (a), (g). Specifically, the requirement increases by one per cent each year beginning in 2010. G. L. c. 25A, § 11F (a).

[19]The Global Warming Solutions Act (GWSA), St. 2008, c. 298, § 6, requires the Secretary of Energy and Environmental Affairs to develop standards of greenhouse gas emissions that require Statewide limits at least eighty per cent below the 1990 level by 2050, with appropriate interim limits beginning in 2020. G. L. c. 21N, § 3 (b). The statute also requires the Executive Office of Energy and Environmental Affairs and the Department of Environmental Protection to develop specific greenhouse gas emissions limits for the electric sector. G. L. c. 21N, § 3 (c).

[20]Finally, the department found that PPA-1 will create 162 jobs per year over the term of the contract — an estimate that was more conservative than Cape Wind's.

[21]AIM joins this argument.

v. *Department of Telecomm. & Energy,* 449 Mass. at 606, quoting *Boston Gas Co.* v. *Department of Telecomm. & Energy,* 436 Mass. 233, 237 (2002).

As previously discussed, the department's analysis was thorough. It carefully considered, and in some cases adopted, counter arguments made by the interveners. It relied on a number of independent analyses and forecasts to reach its ultimate conclusion. The record contained sufficient evidence for a reasonable person to conclude that the benefits of PPA-1 outweighed its costs.

The Alliance argues that the department's interpretation of the term "cost effective" is based on an error of law because the department did not consider the lost opportunity costs to National Grid's customers in its assessment of the costs of the Cape Wind contract. Because § 83 does not define cost effective, interpretation is "left to the discretionary authority and expertise of the department." *Cambridge* v. *Department of Telecomm. & Energy,* 449 Mass. 868, 875 (2007), citing *Wolf* v. *Department of Pub. Utils.,* 407 Mass. 363, 370 (1990). "Where, as here, the case involves interpretation of a complex statutory and regulatory framework, '[w]e give great deference to the department's expertise in areas where the Legislature has delegated its decision making authority.' " *Cambridge* v. *Department of Telecomm. & Energy, supra,* quoting *MCI Telecomm. Corp.* v. *Department of Telecomm. & Energy,* 435 Mass. 144, 150-151 (2001).

Although the Alliance claims in its reply brief that it "never argued that only the lowest price contract can be approved," its argument about the department's alleged failure to consider lost opportunity costs, when reduced to its essence, is an argument that "cost effective" means lowest cost. The Alliance and Trans-Canada contend that the contract is not cost effective because National Grid could have obtained even more benefits (in the form of more renewable energy) for the same cost from other suppliers. But the fact that PPA-1's costs are high relative to other suppliers by itself does not negate the contract's capacity to be cost effective.[22] The department appropriately considered

---

[22]It is significant that § 83 contains no language stating that PPAs must be at the lowest cost to be cost effective; if the Legislature intended this meaning,

opportunity costs in its consideration of whether PPA-1 was in the public interest (see part 2.c, *infra*), assessing in that context whether the above-market costs of PPA-1 were correspondingly outweighed by the benefits it provides, and whether those same benefits might be provided at a lower cost by another energy source eligible under § 83.

The Alliance also asserts that the department's interpretation of the term "cost-effective" is unreasonable because it failed to take the alternative compliance payment (ACP) provisions in G. L. c. 25A, § 11F, into account.[23] Section 11F provides that a portion of the energy provided by retail suppliers must be from renewable energy generating sources. G. L. c. 25A, § 11F (*g*). If retail suppliers fail to meet the requirement by purchasing RECs, they may fulfil their obligation by paying the ACP set by the DOER. G. L. c. 25A, § 11F (*h*). The Alliance argues — as it did before the department — that a renewable energy contract with a price higher than the combination of the cost of nonrenewable energy plus the corresponding ACP payment cannot be "cost-effective" within the meaning of § 83, because it would cost less for a distribution company to purchase solely nonrenewable energy and pay the required ACP premium than it would to contract with a more expensive renewable energy developer. In the Alliance's view, the Legislature would not have provided the ACP option if it intended companies to pay more than the market rate plus the ACP premium for renewable energy.

By its terms, § 83 directs the department to weigh the costs and benefits of proposed contracts; the section does not mention the ACP premium as a factor to be considered. Section 83 also states explicitly that its long-term contracting requirement is "separate and distinct" from the RPS requirements of § 11F, see § 83, first par., reflecting a clear legislative intent to distinguish between the two statutes. We view the department's interpretation of cost effective, which does not take ACP payments into account, as consistent with the terms and mandate of § 83, and well within its discretionary authority to adopt. See,

it could have stated so explicitly, as it has done in other statutes regulating utility companies. See, e.g., G. L. c. 164, § 94G (*a*), second par. (companies must provide sworn statement that they have "used all reasonable means to procure the lowest possible costs for all fuel and purchased power").

[23]TransCanada and AIM join in this argument.

e.g., *Goldberg* v. *Board of Health of Granby*, 444 Mass. 627, 636 (2005).

c. *Public interest finding.* The department looked at the issue of cost in two places in its decision. First, it considered whether PPA-1 was cost effective within the meaning of § 83 (the focus of part 2.b, *supra*). Second, it considered cost in order to determine whether the contract was in the public interest, an analysis required as part of the department's regulatory responsibility for public utility rates. See G. L. c. 164, § 94. The Alliance[24] challenges the finding, included within the department's public interest analysis, that the benefits of PPA-1 exceed those that could be provided by other renewable energy sources. The thrust of the argument is that the department's finding is unsupported by substantial evidence; the Alliance contends that National Grid could have contracted with other renewable energy suppliers at a far lower cost, and this means the contract was not in the public interest.

The department recognized in its decision that lower-priced alternatives exist, but explained, "cost is not the sole factor we consider. . . . To the extent that the costs of PPA-1 exceed the cost of other potential [§] 83 contracts, its benefits should correspondingly exceed the benefits of those contracts." The department determined that the unique benefits of PPA-1 — its size, capacity factor,[25] location, and stage of development — exceed the benefits from other renewable resources, and justify the higher cost. Contrary to the Alliance's claim, the record offers substantial evidentiary support for this conclusion. The proposed size of PPA-1 is 234 MWs — almost as much as all of the existing utility-scale wind generators in New England combined.[26] The record also contains evidence that the Cape Wind

---

[24]TransCanada and AIM join this argument.

[25]The United States Energy Information Administration defines "capacity factor" as "the ratio of the electrical energy produced by: (1) a generating unit for the period of time considered; to (2) the electrical energy that could have been produced at continuous, full power operation during the same period." D.P.U. 10-54 at 9 n.11.

[26]As of 2009, the combined size of all utility-scale wind generation projects in New England combined was 248 megawatts (MWs). Only ninety MWs of this total is integrated into ISO-New England's system, which transmits energy through high-voltage lines to local distribution lines that serve consumers.

facility provides significant and special advantages by virtue of its location near an area that uses high levels of electricity and the advanced stage of the permitting process for the facility.[27] As for the Alliance's assertion that renewable resources in southern New England and New York could provide the same benefits, there is evidence that the transmission of energy from such locations would likely require improvements and enhancements to the available transmission routes and facilities — resulting in costs and logistical challenges that the Cape Wind facility does not present. Offshore wind generating facilities also have a greater capacity factor than generators run on other types of renewable resources, meaning that it is more efficient to produce electricity from offshore wind. In sum, our review of the record indicates that there was clearly sufficient evidence on which the department could base its conclusion that the special benefits of PPA-1 exceeded those of other renewable energy resources, and we uphold the department's conclusion that approval of the contract was in the public interest.

d. *Individual negotiations.* NEPGA argues that the department wrongfully permitted National Grid to solicit a proposal from Cape Wind through individual negotiations.[28] In NEPGA's view, National Grid should have been required to solicit multiple competitive proposals. We disagree.[29]

Under § 83, "[t]he electric distribution company shall select

[27]See Testimony of Dr. Susan Tierney ("no other eligible renewable energy project or set of projects . . . have been announced that can provide the same reliability benefits in Massachusetts on the same time frame as Cape Wind"); testimony of Dennis J. Duffy ("Cape Wind's unique location, nearby the largest load center in Massachusetts and New England, . . . eliminat[es] the cost and uncertainty of transmission additions that would be associated with large increments of energy from sources at distant locations"); United States Department of Energy White Paper, Natural Gas in the New England Region: Implications for Offshore Wind Generation and Fuel Diversity at 10 (2004) ("During the January 14-16, 2004 period of natural gas shortage, the Cape Wind project, if it had been fully constucted and was online, would have made a significant contribution to the power supply and reliability of the regional grid").

[28]TransCanada and AIM join this argument.

[29]No appeal was taken from the department's decision in D.P.U. 09-138, which authorized negotiations between National Grid and Cape Wind. Thus, the department argues that NEPGA has waived its right to raise the issue in the present appeal. The department's decision in D.P.U. 09-138, however, states specifically that "[p]arties will have the opportunity to raise relevant substantive issues with respect to the evaluation of the proposed project,

a reasonable method of soliciting proposals from renewable energy developers, which *may include* public solicitations, *individual negotiations* or other methods" (emphasis added). St. 2008, c. 169, § 83, second par. NEPGA claims that the use of the word "proposals" in its plural form means that distribution companies must solicit multiple proposals each time they seek to enter a new contract. However, because the first paragraph of § 83 states that proposals must be solicited "twice" over the five-year period, it would not make sense to use the singular "proposal," when at least two proposals necessarily will be solicited in order to comply with the statute.[30]

In any event, to the extent there is some uncertainty in the language chosen, we give substantial deference to the department's reasonable interpretation of the statutory language. *City Council of Agawam* v. *Energy Facilities Siting Bd.*, 437 Mass. 821, 828 (2002). "[T]he substantial deference owed to an agency's interpretation of a statute it is charged to enforce includes approving an interpretation of statutory language that may be read in two ways." *Alliance to Protect Nantucket Sound, Inc.* v. *Energy Facilities Siting Bd.*, 448 Mass. 45, 50 n.6 (2006), citing *Boston Edison Co.* v. *Bedford*, 444 Mass. 775, 783 (2005). The department construed the statute to mean that companies are permitted to solicit a proposal from a single renewable energy developer. We think this is a reasonable reading of the provision at issue, given that the Legislature, if it wished to provide for solicitation of multiple, competitive proposals from developers, could have so stated explicitly in § 83, as it did in

*including contract development and negotiation* . . . in the context of the adjudication before the [d]epartment of the proposed long-term contract for renewable energy" (emphasis added). D.P.U. 09-138 at 12. While the import of this language is not entirely clear, it appears to indicate that parties would be permitted to challenge the form of the contract negotiations that National Grid and Cape Wind actually undertook in the present proceeding, D.P.U. 10-54, in which the department was reviewing the contract that resulted from those negotiations. Accordingly, we consider the merits of NEPGA's claim.

[30]We disagree with NEPGA's argument in its reply brief that the word "twice" alone is sufficient to convey this meaning without the plural "proposals." Although we did find on the facts in another case that the word "annual" conveys repetition and therefore the plural form of the word "periods" must have independent significance, this type of inquiry is unique to the language and context of each statute. Here, § 83's authorization of "individual negotiations" belies NEPGA's interpretation. See note 32, *infra*.

other sections of the GCA.[31] See *Ciardi* v. *F. Hoffmann-La Roche, Ltd.*, 436 Mass. 53, 62-63 (2002), citing *Commonwealth* v. *Galvin*, 388 Mass. 326, 330 (1983) ("where the Legislature has employed specific language in one paragraph, but not in another, the language should not be implied where it is not present").

Furthermore, "words importing the plural number may include the singular" when interpreting Massachusetts statutes. G. L. c. 4, § 6, Fourth. Where the Legislature explicitly authorized the solicitation of proposals through individual negotiations,[32] allowing companies to engage in negotiations with one developer would not "involve a construction inconsistent with the manifest intent of the law-making body or repugnant to the context of the same statute." G. L. c. 4, § 6.

NEPGA argues also that the department was not entitled to authorize individual negotiations between National Grid and Cape Wind, notwithstanding the provision in § 83 that, as just stated, authorizes such a course, because contracts for energy supplied to basic service customers must be procured through competitive bidding in order to comply with G. L. c. 164, § 1B (d) (§ 1B [d]).[33,34] Under NEPGA's reading, individual negotiations are only appropriate under § 83 when the resulting

---

[31]See, e.g., G. L. c. 21A, § 21, inserted by St. 2008, c. 169, § 7 (requiring creation of "a bidding process for the competitive procurement of electric generation"); G. L. c. 25, § 19 (a), as appearing in St. 2008, c. 169, § 11 ("competitive procurement processes" must be utilized "to the fullest extent practicable").

[32]NEPGA also reads a requirement of soliciting multiple bids into the use of the word "negotiations," arguing that this means an electric company must enter more than one individual negotiation. We again disagree. Because the process of developing a contract often spans multiple days and multiple meetings of the parties, it is common to describe such activity as "negotiations," even if the negotiations occur between the same two parties. The Legislature itself used "negotiations" to refer to discussions between only two parties in another section of the GCA. See G. L. c. 25A, § 11I, as appearing in St. 2008, c. 169, § 37 ("If the agency, body or authority is unable to negotiate a satisfactory contract . . . negotiations with that person shall be formally terminated. The agency, body or authority shall then undertake negotiations with the second most qualified person").

[33]NEPGA states that the department previously has construed G. L. c. 164, § 94A (§ 94A), to require competitive bidding. Section 94A obligates gas and electric companies to receive departmental approval for any contract for the purchase of gas or electricity lasting longer than one year. While decisions of the department have stated that the solicitation process for basic service

contract will purchase renewable energy and RECs to sell to the wholesale spot market.

"Where possible, we construe statutes on the same subject matter together, 'so as to constitute a harmonious whole consistent with the legislative purpose.' " *District Attorney for the N. Dist. v. School Comm. of Wayland*, 455 Mass. 561, 568-569 (2009), quoting *Board of Educ. v. Assessor of Worcester*, 368 Mass. 511, 513-514 (1975). In this case, we agree with the department that it is essentially impossible to read §§ 83 and 1B (*d*) harmoniously. NEPGA suggests a conflict between § 83 and § 1B (*d*) properly can be avoided by limiting distribution companies to the second option — selling in the spot market — insofar as basic service customers are concerned, because that will involve competitive bidding. In order to accept this position, however, we would need to ignore the actual language of § 83, which specifically allows a distribution company *either* to use the energy it purchases for resale to its customers *or* to sell the associated RECs in the wholesale spot market. "The long-standing test for the principle of implied repeal is whether the prior statute is so repugnant to, and inconsistent with, the later enactment that both cannot stand. Only then is the former statute repealed." *Alliance to Protect Nantucket Sound, Inc. v. Energy Facilities Siting Bd.*, 457 Mass. 663, 673 (2010), quoting *Dedham Water Co. v. Dedham*, 395 Mass. 510, 518 (1985). If "a general statute and a specific statute cannot be reconciled, the general statute must yield to the specific statute." *Commonwealth v. Russ R.*, 433 Mass. 515, 521 (2001), quoting *Pereira v. New England LNG Co.*, 364 Mass. 109, 118 (1973). This is particularly true if the specific statute was enacted after the more general statute. See *Commonwealth v. Russ R., supra.*

---

contracts must be competitive, these decisions identify the source of this requirement as G. L. c. 164, § 1B (*d*), not § 94A. See, e.g., NSTAR Elec. Co., D.P.U. 07-64-A at 59 (2008) (G. L. c. 164, § 1B [*d*], "requires basic service to be competitively procured").

[34]While NEPGA cites "pro-competition provisions" in other sections of the GCA as evidence that the legislative purpose of § 83 was to retain the competitive bidding model, these provisions prove the opposite. They show that the Legislature knows how to write a statute to require competitive bidding, but chose not to include "pro-competition" language in § 83, and instead explicitly listed individual negotiations as an approved method for soliciting proposals. See note 31, *supra.*

Here, § 83, enacted in 2008, prescribes appropriate solicitation processes for long-term renewable energy contracts, while § 1B (*d*), enacted in 1997, delineates the appropriate solicitation process for all basic service contracts, regardless of length or type of electricity source. The department reasonably concluded that the more specific and recent provisions of § 83, authorizing individual negotiations or competitive bidding in the specific context of long-term renewable energy contracts, should apply, rather than the more general, older provisions of § 1B (*d*). We defer to the department's interpretation, as the agency charged with enforcement of both statutes. See, e.g., *Providence & Worcester R.R.* v. *Energy Facilities Siting Bd.*, 453 Mass. 135, 141 (2009).

e. *Three per cent cap.* PPA-1 provides for National Grid's purchase of renewable energy for Cape Wind in an amount equal to 3.5 per cent of its customer load. AIM[35] claims that the department's decision to approve the contract with that provision intact was based on an error of law. According to AIM, "the mandatory solicitations were meant to be part of a limited experiment bounded by a [three per cent] cap," which PPA-1 exceeds. After contracts up to the mandatory three per cent cap have been executed, the argument goes, companies voluntarily may enter into additional long-term contracts for renewable energy, but these voluntary contracts need to be evaluated under a separate and distinct "best interest of the customer" standard.

The short answer to AIM's argument is that it is inconsistent with the language of the Act. Section 83 states:

> "*Distribution companies shall not be obligated to* enter into long-term contracts . . . that would, in the aggregate, exceed [three] per cent of the total energy demand from all distribution customers in the service territory of the distribution company. As long as the electric distribution company has entered into long term contracts in compliance with this section, it shall not be required by regulation or order to enter into contracts with terms of more than [three] years in meeting its applicable annual RPS requirements . . . unless the department of public utilities

---

[35]TransCanada joins this argument.

finds that such contracts are in the best interest of custom-
ers . . ." (emphasis added).

St. 2008, c. 169, § 83, fourth par.

This provision of § 83 plainly prevents the department from
forcing distribution companies to enter long-term contracts for
more than three per cent of their total energy demand from all
customers, but contains no provision that would preclude com-
panies from choosing to contract for a higher percentage on
their own. Nor does the provision prescribe a heightened or in
any event different standard of review by the department with
respect to voluntary contracts. A "best interest" finding is only
necessary if a company is "required by regulation or order" to
enter into a contract, which is not the case here. St. 2008, c. 169,
§ 83, fourth par. Because the language of the statute is clear,
we need not look to outside evidence of legislative intent. See
*Commonwealth* v. *DeBella*, 442 Mass. 683, 687 (2004), quoting
*Hashimi* v. *Kalil*, 388 Mass. 607, 610 (1983). The department
construed the provisions of § 83 at issue correctly.[36]

f. *Cost recovery.* In its filing with the department, National
Grid proposed to use the energy and RECs purchased through
PPA-1 for its basic service customers. Those customers would
continue to pay the current basic service rates, and the differ-
ence between the basic service rates and the contract price
(above-market costs) would be recovered from all distribution
customers (that is, both basic service and competitive supply
customers) through a cents-per-kilowatt-hour charge. The statu-
tory remuneration (see note 36, *supra*) also would be recovered
from all distribution customers through a uniform charge. AIM
and NEPGA[37] argue that the department acted in excess of its

---

[36]In reliance on its three per cent cap argument, AIM also claims that National
Grid is not entitled to remuneration for the portion of the energy procured in
PPA-1 in excess of three per cent of its total customer demand. Section 83
orders the department to issue regulations that "provide for an annual remunera-
tion for the contracting distribution company equal to [four] per cent of the an-
nual payments under the contract." St. 2008, c. 169, § 83, third par. The section
makes no distinction between contracts for three per cent or less of load and
contracts for over three per cent of load. We think the unambiguous terms of the
statute mandate the result reached by the department, namely, that National Grid
is entitled to remuneration from customers in the amount of four per cent of the
total annual payments made to Cape Wind under the entire contract.

[37]TransCanada joins this argument.

statutory authority when it approved this procedure for recovering above-market costs. Where, as here, the claim is one that charges ultra vires administrative action, our evaluation must consider both the authority specifically conferred on the department by § 83 and that conferred more generally by the department's enabling statutes, G. L. c. 25 and G. L. c. 164. "An agency's powers are shaped by its organic statute taken as a whole." *Massachusetts Hosp. Ass'n* v. *Department of Med. Sec.*, 412 Mass. 340, 342 (1992), quoting *Commonwealth* v. *Cerveny*, 373 Mass. 345, 354 (1977). The "[p]owers granted include those necessarily or reasonably implied." *Massachusetts Hosp. Ass'n* v. *Department of Med. Sec.*, *supra*, quoting *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health*, 379 Mass. 70, 75 (1979). Applying these principles, we conclude that the interveners' argument fails.

As previously stated, § 83 authorizes distribution companies to retain renewable energy and RECs acquired through long-term contracts for their own customers. St. 2008, c. 169, § 83, fifth par. Alternatively, companies may sell the energy on the wholesale market and sell the RECs through competitive bidding. *Id.* If a distribution company chooses to sell its purchased power into the wholesale spot market and auction its RECs, § 83 specifies a procedure for recovering costs incurred under the contract from all distribution customers. St. 2008, c. 169, § 83, sixth par. However, it does *not* specify how costs are to be recovered if a company retains the power and RECs for sale to its basic service customers, as National Grid proposed. And while it is correct that § 83 does not explicitly grant the department authority to approve cost-recovery methods, G. L. c. 164, § 94, gives the department broad power to enter orders concerning the "rates, prices, charges and practices" in contracts for the sale of electricity by electric companies "as the public interest requires." G. L. c. 164, § 94, third par. See *Massachusetts Elec. Co.* v. *Department of Pub. Utils.*, 419 Mass. 239, 245 (1994). It is well established that the department has the statutory authority to rule on the appropriateness of proposed cost-recovery formulas. See, e.g., *Attorney Gen.* v. *Department of Pub. Utils.*, 453 Mass. 191 (2009); *Hingham* v. *Department of Telecomm. & Energy*, 433 Mass. 198 (2001).

Although NEPGA argues that the department has previously

interpreted § 1B (*d*) to mean that the cost of energy used for basic service customers may be charged only to basic service customers, the department's decision in this proceeding is not precluded by the fact that the proposed cost recovery method is novel, particularly in light of the new emphasis on development of renewable energy in the GCA and the GWSA.[38] "Where the result of employing a specific methodology in rate setting is not impermissible, the choice of the methodology is a matter committed to agency discretion and is beyond the scope of our review." *Attorney Gen.* v. *Department of Pub. Utils.*, 392 Mass. 262, 268 (1984). The department permissibly determined that the environmental benefits of PPA-1, including compliance with RPS and GWSA requirements, will accrue to all National Grid customers, and it is therefore appropriate to require all customers to share in the costs of acquiring these benefits, in accordance with departmental precedent.[39] See Investigation into the Pricing and Procurement of Default Service Pursuant to G. L. c. 164, § 1B (*d*), D.T.E. 99-60-C at 13 (2000) ("this obligation benefits all customers, and therefore, the over- or under-recovery should be spread among all customers"). Cf. *American Hoechest Corp.* v. *Department of Pub. Utils.*, 379 Mass. 408, 413-414 (1980) (reasoning that because both residential and industrial customers shared benefits of reduced rate for low-income elderly customers, the cost of reduced rate could be levied on both classes of customers).

g. *"Facilitate the financing" requirement.* TransCanada[40] argues that the department erred as a matter of law by requiring National Grid to show that PPA-1 "facilitated the financing" of Cape Wind's wind farm facility. TransCanada contends that the specific statutory requirement that long-term contracts be with facilities that have a commercial operation date on or after January 1, 2008, carries out the more general purpose of facilitating the financing of renewable energy facilities, and therefore distribution companies need only show compliance with the

---

[38]See note 19, *supra*, describing the limits on greenhouse gas emissions imposed by the GWSA.

[39]Evidence in the record included testimony of Mark E. Garrett, a consultant for AIM, that all of National Grid's customers would benefit from the development of renewable energy.

[40]AIM joins this argument.

commercial operation date provision — they should not be required to demonstrate that the particular contract will facilitate financing of a specified project as well.

The provisions in § 83 at the heart of this particular challenge are in the section's first and third paragraphs. The first paragraph provides in relevant part: "[E]ach distribution company . . . shall . . . enter into cost-effective long-term contracts to facilitate the financing of renewable energy generation." St. 2008, c. 169, § 83, first par. In the third paragraph, the department is directed to adopt regulations consistent with the Act, including, among others, a regulation requiring that the renewable energy generating source have a commercial operation date on or after January 1, 2008. St. 2008, c. 169, § 83, third par. The Act as a whole expressly states that its purpose is "to provide forthwith for renewable and alternative energy and energy efficiency in the [C]ommonwealth." St. 2008, c. 169, preamble. The department reasonably concluded that the commercial operation date of a renewable energy facility alone was not sufficient to ensure that a contract facilitated the financing of renewable energy generation, because it is possible for a project already to have been fully financed before 2008, even if it began operating after that date; and therefore, a more effective way to carry out the legislative purpose was to require a showing that the contract itself helps to facilitate the financing of a new renewable energy generation source. Again, we defer to the department's reasonable interpretation. See *Cambridge* v. *Department of Telecomm. & Energy*, 449 Mass. at 875; *City Council of Agawam* v. *Energy Facilities Siting Bd.*, 437 Mass. at 828.

3. *Conclusion.* For the reasons stated, the case is remanded to the county court, where the single justice will affirm the department's decision.

*So ordered.*